Alfred Arthur SANDOVAL,
Petitioner–Appellee,

v.

Arthur CALDERON, Warden of the California State Prison at San Quentin, Respondent–Appellant.

Alfred Arthur Sandoval, Petitioner–Appellant,

v.

Arthur Calderon, Warden of the California State Prison at San Quentin, Respondent–Appellee.

Nos. 99–99010, 99–99013.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 13, 2000

Filed Nov. 6, 2000

Amended Feb. 21, 2001

Jeffrey B. Kahan, Deputy Attorney General, Los Angeles, California, for the respondent-appellant/appellee.

Manuel U. Araujo, Beverly Hills, California and Michael S. Magnuson, Whittier, California, for the petitioner-appellee/appellant.

C. Renee Manes, Assistant Federal Public Defender, Los Angeles, California; John T. Philipsborn, San Francisco, California; and Joseph Schlesinger, Assistant Federal Public Defender, Sacramento, California, for the amici.

Before: SCHROEDER, HAWKINS and FISHER, Circuit Judges.

Opinion by Judge SCHROEDER; Dissent by Judge FISHER

### ORDER

The Brief of Amici Curiae is ordered filed.

The majority opinion filed November 11, 2000, is amended as follows:

At 231 F.3d 1140, 1145, delete the last paragraph under "APPLICABILITY OF AEDPA" and insert the following paragraph: "We also reject the State's argument that *Ortiz v. Stewart*, 149 F.3d 923 (9th Cir.1998), *cert. denied*, 526 U.S. 1123, 119 S.Ct. 1777, 143 L.Ed.2d 806 (1999), requires us to apply the substantive changes wrought by AEDPA to Sandoval's habeas petition. Because Sandoval filed his section 2254 petition in the district court prior to the enactment of AEDPA, pre-AEDPA law governs his right to relief in the trial court. *See Slack v. McDaniel*, 529 U.S. 473, 486–87, 120 S.Ct. 1595, 1605, 146 L.Ed.2d 542 (2000)."

At 231 F.3d 1140, 1154 delete the second paragraph under the heading "DENIAL OF LEAVE TO AMEND", and add the following sentence to the end of the first paragraph under that same heading:

"We have reviewed the record and find no abuse of discretion by the district court. *See Bonin v. Calderon*, 59 F.3d 815, 845–46 (9th Cir.1995)."

At 231 F.3d 1140, 1151, delete the second full paragraph beginning with "The Establishment Clause...."

With these amendments, the panel majority has voted to deny the petition for rehearing and to reject the suggestion for rehearing en banc. Judge Fisher would grant rehearing on the *Faretta* issue.

The full court has been advised of the suggestion for rehearing en banc and no active judge has requested a vote on whether to rehear the matter en banc. Fed. R.App. P. 35.

The petition for rehearing and the petition for rehearing en banc are denied.

### OPINION

SCHROEDER, Circuit Judge:

California state prisoner Alfred Arthur Sandoval was convicted of four murders and one attempted murder. He was sentenced to death for one of the murders and to life imprisonment without possibility of parole on the other murder charges. The California Supreme Court affirmed the convictions and, over the dissent of Justice Mosk, the sentences. *See People v. Sandoval*, 4 Cal.4th 155, 14 Cal.Rptr.2d 342, 841 P.2d 862 (Cal.1992). Justice Mosk would have vacated the death sentence and held that the prosecutor's penalty phase summation by its heavy reliance on religious authority in arguing to the jury that the death penalty was sanctioned by God, was not harmless beyond a reasonable doubt. *See id.* at 205, 14 Cal.Rptr.2d 342, 841 P.2d 862 (Mosk, J., concurring and dissenting).

After the California Supreme Court denied Sandoval's petitions for collateral review, the district court granted habeas re-

lief on the ground that the trial for the single murder count on which the death penalty was imposed should have been severed from the trial on the other crimes. The court reasoned that the victim in the former was more innocent than the other victims. The district court otherwise denied relief, and both Sandoval and the State appeal.

We find no constitutional infirmity in Sandoval's convictions. The trial court was not required to sever any counts in this case. The district court therefore erred in granting the writ on severance grounds. We also reject Sandoval's claim that he was denied his right to represent himself under *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). The trial court did not err in accepting defense counsel's representation that Sandoval would accept library privileges in lieu of representing himself at trial.

Although we find Sandoval's challenges to his convictions to be without merit, we do hold that Sandoval is entitled to habeas relief from his death sentence. Sandoval was denied a fair penalty phase trial by the prosecutor's closing argument that invoked divine authority and paraphrased a well known Biblical passage as support for imposition of the death penalty.

### BACKGROUND

Sandoval was convicted of two sets of crimes. The first set occurred in Belvedere Park in Los Angeles during a gang-related fight in the early morning hours of October 14, 1984. At the guilt phase of the trial, three witnesses testified that Sandoval, a member of the Arizona Marivilla gang, shot Gilbert Martinez and Anthony Aceves in the head at close range. He also shot Manuel Torres in the neck, but Torres did not die from the wound. The victims were all members of the Mariana Marivilla gang.

About two weeks later, on October 31, 1984, Ray and Marlene Wells were shot to death in their home. Forensic evidence showed that Ray, like Martinez and Aceves, was shot "execution style" in the head at close range. Marlene was shot from a greater distance. At trial, the Wellses' neighbor testified that he heard shots the night of the murders and saw the silhouette of a medium-sized person with slicked-back hair, leave the house. He also noticed a dark Chevrolet parked near the Wellses' home. He initially thought the car was an Impala, but after consulting one of his car books, determined that the car was a 1968 Caprice.

Benjamin Verduzco, a long-time friend of Sandoval's, testified that Sandoval hid the car he drove the night of the Belvedere Park murders in Verduzco's garage. One morning while Sandoval was at Verduzco's house, Ray and Marlene Wells visited the house. Later the same day, the police impounded the car Sandoval had hidden at Verduzco's house. The Wellses were killed a few days later.

The night of the Wells murders, Verduzco received a call from Sandoval during which Sandoval told him that he "just did the big mouth in." When Verduzco questioned who the "big mouth" was, Sandoval asked him if he remembered "the one who was there in the morning with the car" and used the name "R." Sandoval also told him that he "had to do her, too" because she saw him kill "R."

The State also put on evidence that connected Sandoval to the car observed at the Wells murder site. On October 7, 1984, a black 1968 Caprice in good condition matching the description of the car at the murder scene was stolen from the Los Angeles zoo parking lot. Sandoval bought a run-down 1968 Chevy Caprice sometime in October 1984. Police later found the stolen car at the Mexican border at Tecate with a license plate and vehicle identification number with a "pink slip" in the name of the previous owner of the Caprice sold to Sandoval. The driver of the stolen car was a member of the Arizona Marivilla gang.

The jury found Sandoval guilty of four counts of first degree murder and one count of attempted murder. It also found true the special circumstances of multiple murder within the meaning of California Penal Code Section 190.2(a)(3), making Sandoval eligible for the death penalty.

During the penalty phase of the trial, the State presented aggravating evidence about Sandoval's behavior, including witness testimony about specific events demonstrating Sandoval's history of violence. In mitigation, Sandoval presented testimony from friends and family members who described his abused childhood and his commitment to his family, his positive contributions to his community, and his service as a prisoner trustee.

During the prosecutor's summation to the jury, he argued that Sandoval should be put to death for the murders. In urging the jury to return death verdicts, the prosecutor relied heavily on religious authority as commanding capital punishment for Sandoval's crimes.

The jury deliberated for three and a half days before notifying the trial judge that it was irretrievably deadlocked. After the judge returned the jury to its deliberations, it reached a verdict after one hour and forty minutes. It concluded that Sandoval should be sentenced to death for the murder of Marlene Wells and to life without possibility of parole for the other murders. The convictions were affirmed on appeal. See People v. Sandoval, 4 Cal.4th 155, 14 Cal.Rptr.2d 342, 841 P.2d 862 (Cal. 1992). The Supreme Court granted certiorari to consider whether California's "reasonable doubt" jury instruction violated due process. The Court upheld the instruction. See Victor v. Nebraska, 511 U.S. 1, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994).

Sandoval filed a petition for a writ of habeas corpus with the California Supreme Court raising several challenges to his convictions and sentences. The court denied the petition on the merits in an unpublished order. Sandoval then, on July 1, 1996, filed a federal habeas petition which he amended on July 29, 1996. In an effort to exhaust some of the claims in his federal petition, Sandoval also filed a second habeas petition in the California courts.

The district court originally stayed the federal petition pending exhaustion of state remedies. It declined to extend the stay, however, and granted the State's motion to strike Sandoval's unexhausted claims. Meanwhile, the Supreme Court of California denied some of the claims in Sandoval's second petition on the merits and found the rest of the claims procedurally barred.

With respect to the exhausted claims, the district court dismissed several of Sandoval's claims on the pleadings, including his claim that he was erroneously denied the right to represent himself, that a mistrial should have been declared after the penalty phase trial on account of jury deadlock, and that improper prosecutorial argument denied him a fair penalty phase trial. The court granted summary judgment to the State on each of Sandoval's remaining claims, except his claim that the trial court should have severed the Belvedere Park counts from the Wells counts at trial. The district court found that the conviction and sentence for the murder of Marlene Wells was constitutionally infirm because the trial court should have severed her count from the other counts on the ground that she was not tied to any gang or other illegal activity and hence was an innocent victim. The court did not dispute the State's contention, however, that all of the shootings would be admissible in a separate trial for the murder of Marlene Wells. Finding that Sandoval was prejudiced by the joinder only on the Marlene Wells count, the court denied the writ as to the remaining convictions and sentences.

## APPLICATION OF AEDPA

■ Before turning to the merits of these appeals, we must first determine

whether the provisions of the Anti–Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104–132, 110 Stat. 1214 (Apr. 24, 1996), apply to this case. AEDPA's provisions for federal review of state prisoner petitions do not apply to cases that were pending prior to its effective date, April 24, 1996. *See Lindh v. Murphy*, 521 U.S. 320, 327, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). On December 7, 1994, Sandoval had filed a motion with the district court for appointment of counsel and for a stay of execution in order to prepare a habeas petition. We have held that such a filing is sufficient to create a "pending" case for AEDPA purposes. *See Calderon v. United States District Court (Kelly)*, 163 F.3d 530, 540 (9th Cir.1998) (en banc), *cert. denied*, 526 U.S. 1060, 119 S.Ct. 1377, 143 L.Ed.2d 535 (1999). Therefore, pre-AEDPA law governs our review.

The State nevertheless contends that the expedited procedures of AEDPA's Chapter 154, 28 U.S.C. §§ 2261–66 (West Supp.2000) apply in this case. In contrast to § 2254, Chapter 154 applies to cases that were pending at the time AEDPA was signed into law. Chapter 154 creates a quid pro quo arrangement whereby states that meet certain statutory requirements for unitary review and appointment of counsel are entitled to limit federal habeas litigation to petitions filed within 180 days after state court proceedings are completed. *See* 28 U.S.C. § 2263(a).

The State argues that California's unitary review system qualifies for Chapter 154's expedited review procedures. We have already rejected this claim. *See Ashmus v. Woodford*, 202 F.3d 1160, 1165 (amended opinion) (holding that, at least until January 1, 1998, California's unitary review scheme did not comply with the eligibility requirements of Chapter 154 and that the state therefore could not avail itself of the procedural advantages of that Chapter), *cert. denied*, — U.S. ——, 121 S.Ct. 274, 148 L.Ed.2d 199 (2000) (No. 99–1720).

We also reject the State's argument that *Ortiz v. Stewart*, 149 F.3d 923 (9th Cir. 1998), *cert. denied*, 526 U.S. 1123, 119 S.Ct. 1777, 143 L.Ed.2d 806 (1999), requires us to apply the substantive changes wrought by AEDPA to Sandoval's habeas petition. Because Sandoval filed his section 2254 petition in the district court prior to the enactment of AEDPA, pre-AEDPA law governs his right to relief in the trial court. *See Slack v. McDaniel,* 529 U.S. 473, 486–87, 120 S.Ct. 1595, 1605, 146 L.Ed.2d 542 (2000).

## SEVERANCE

The parties spend a great deal of time debating whether any claim that the Marlene Wells murder count should have been severed from the remaining charges was properly before the district court when it ruled such severance was required. The State takes the position that it was not, because Sandoval moved to sever both of the Wells murder counts from the Belvedere Park counts. We need not parse the petitioner's contentions so finely because we conclude that due process did not require a separate trial on any of the counts.

Before trial, Sandoval twice moved to sever the Belvedere Park charges from the Wells murder charges. His principal argument was that evidence for each of the two sets of crimes lacked cross-admissibility. The trial court denied both motions. It noted that the prosecution's theory of the case was that the Wells killings occurred because of the Belvedere Park killings. It found that if the prosecutor came forward with evidence linking the two crimes, the evidence would be cross-admissible. Based upon the prosecutor's assurances that Benjamin Verduzco's testimony would provide that evidentiary link, the court denied the severance motions. The testimony did provide that link.

On habeas review of a prisoner's challenge to a trial court's failure to sever trial of some counts in an indictment, we may only grant the writ if the joinder

resulted in an unfair trial. There is no prejudicial constitutional violation unless "simultaneous trial of more than one offense ... actually render[ed] petitioner's state trial fundamentally unfair and hence, violative of due process." *Featherstone v. Estelle,* 948 F.2d 1497, 1503 (9th Cir.1991). This prejudice is shown if the impermissible joinder had a substantial and injurious effect or influence in determining the jury's verdict. *See Bean v. Calderon,* 163 F.3d 1073, 1086 (9th Cir.1998), *cert. denied* 528 U.S. 922, 120 S.Ct. 285, 145 L.Ed.2d 239 (1999).

■■ We have recognized that the risk of undue prejudice is particularly great whenever joinder of counts allows evidence of other crimes to be introduced in a trial where the evidence would otherwise be inadmissible. *See United States v. Lewis,* 787 F.2d 1318, 1322 (9th Cir.1986). Undue prejudice may also arise from the joinder of a strong evidentiary case with a weaker one. *See id.; Bean,* 163 F.3d at 1085. The reason there is danger in both situations is that it is difficult for a jury to compartmentalize the damaging information. *See Bean,* 163 F.3d at 1084.

Our review of the record in this case leads us to conclude that Sandoval was not actually prejudiced by the joinder of the Wells counts with the Belvedere Park counts. The Belvedere Park crimes would have been admissible in a separate Wells crimes trial and the evidence of Sandoval's guilt for the Wells crimes was not significantly weaker than the evidence for the Belvedere Park crimes.

The State alleged that Sandoval murdered the Wellses because he believed Ray Wells told the police that the car Sandoval used in the Belvedere Park murders was hidden in Verduzco's garage. Thus, evidence of the Belvedere Park murders would have been admissible in a separate trial on the Wells murders to prove motive and identity. *See* Cal. Evid.Code § 1101(b) (West 2000) ("Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act."); *see also* Fed. R.Evid. 404(b). Similarly, evidence about the Wells crimes would have been admissible in a Belvedere Park crimes trial. The crimes are linked by Sandoval's car and Verduzco's testimony and because they had a similar modus operandi. Evidence of the separate killings would also have been admissible in both trials to establish the State's allegations of multiple murder special circumstance. *See* Cal.Penal Code § 190.2(a)(3). This cross-admissibility dispels the prejudicial impact of joining all counts in the same trial. *See United States v. Johnson,* 820 F.2d 1065, 1070–71 (9th Cir.1987); *People v. Mason,* 52 Cal.3d 909, 934, 277 Cal.Rptr. 166, 802 P.2d 950 (Cal.1991). The jury would have heard the evidence in any event.

■ Nor is this a case where the State joined a strong evidentiary case with a much weaker case in the hope that the cumulation of the evidence would lead to convictions in both cases. Such joinder is improper. *See Bean,* 163 F.3d at 1085. The State's case against Sandoval for the Belvedere Park crimes was strong. Three eyewitnesses testified that they saw Sandoval shoot the victims. One of the defense's own witnesses admitted during a heated cross-examination that he saw Sandoval at the park that night around the time of the shootings. Defense counsel admitted during closing argument that Sandoval hid his car in Verduzco's garage and fled.

The State's case against Sandoval for the Wells murders was also strong. Prosecution witnesses linked the car at the murder scene to Sandoval and Verduzco's

testimony incriminated Sandoval directly. Sandoval points out that the defense impeached Verduzco by establishing that his testimony had been inconsistent at times, that he had several prior convictions, and that he was testifying in exchange for $600 a month, a new identity, and early release from prison. The issue of credibility was, however, for the jury and it ultimately credited Verduzco's testimony.

Given the strength of the State's case against Sandoval on both sets of crimes, and the cross-admissibility of the evidence on each set, we conclude that Sandoval's trial was not actually prejudiced by the joinder. In so holding, we reject Sandoval's argument that we must reach the same result as reached in *Bean*. *Bean* involved the joinder of a strong evidentiary case with a relatively weak one and the use of evidence that was not cross-admissible for both sets of crimes. 163 F.3d at 1084–85.

■ We also reject the district court's finding that Sandoval was prejudiced by the trial court's failure to sever the Marlene Wells count from the remaining counts. The district court held that severance was required because Marlene Wells was an innocent victim and the other victims were all of questionable character. Yet, Marlene Wells was killed at the same time, in the same place, and with the same weapon as her husband, Ray. Moreover, the trial judge had no way of knowing at the time of the pre-trial severance motion that the evidence would eventually show that Marlene Wells was more innocent than the other victims. There was no error, let alone prejudicial error rising to the level of a constitutional violation, in trying the Wells murder counts jointly.

## SELF–REPRESENTATION

Sandoval also contends that he is entitled to a new trial because he was denied his right to represent himself under *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). *Faretta* established a defendant's right to self-representation, provided that the defendant knows of its disadvantages and voluntarily waives counsel.

Sandoval's pretrial motion to represent himself was calendared for hearing before the original trial judge assigned to his case. At the hearing, that judge lectured Sandoval on why self-representation was a bad idea, and counseled Sandoval to accept the help of his lawyers. Sandoval stated that he had already given the idea considerable thought, but the judge delayed ruling on the motion to give Sandoval a week to consider his advice. Sandoval's case was then transferred to another judge.

At a pretrial meeting with the new judge, counsel had a conference at the sidebar to discuss certain matters. The sidebar proceedings were not audible to Sandoval. At this conference, according to Sandoval's verified habeas petition, defense counsel advised the judge that there was a pending *Faretta* motion, but that Sandoval would be satisfied with library privileges instead of self-representation. These were granted. Sandoval alleges that his lawyer's statement to the judge that he was really after library privileges was not accurate. He claims that if he had known that counsel bargained his *Faretta* rights for library privileges he would have protested.

■ The issue for our decision is whether the trial court erred in accepting counsel's representation that Sandoval would be satisfied with library privileges in lieu of self-representation and was instead constitutionally required to question the defendant personally as to whether he was willing to accept counsel's continued assistance at trial. If a personal colloquy was required, we must remand for an evidentiary hearing. We hold, however, that it was not.

■ A criminal defendant has a right to self-representation at trial, provided that the defendant is fully informed about the consequences of such action and

then knowingly waives the benefits of legal counsel. *See id.* at 835, 95 S.Ct. 2525. This right, however, occupies no hallowed status similar to the right to counsel enshrined in the Sixth Amendment. While the right to counsel attaches unless affirmatively waived, the right to self-representation does not attach until asserted. *See Adams v. Carroll,* 875 F.2d 1441, 1444 (9th Cir.1989) ("The right to the assistance of counsel is automatic; ... [t]o exercise the right to self-representation, on the other hand, a criminal defendant must negotiate a number of procedural obstacles."); *Brown v. Wainwright,* 665 F.2d 607, 610 (5th Cir.1980) ("In the absence of a clear and knowing election, a court should not quickly infer that a defendant unskilled in the law has waived counsel and has opted to conduct his own defense."); *see also United States v. Teague,* 953 F.2d 1525, 1538 & n. 4 (11th Cir.1992) (en banc) (Birch, J., concurring in the result) (discussing the preeminence of the right to counsel); *Tuitt v. Fair,* 822 F.2d 166, 174 (1st Cir.1987) ("Where the two rights are in collision, the nature of the two rights makes it reasonable to favor the right to counsel which, if denied, leaves the average defendant helpless."); *United States v. Weisz,* 718 F.2d 413, 425–26 (D.C.Cir.1984) (citing *Brown*).

■ Because invocation of the right to self-representation entails a concomitant forfeiture of the important benefits offered by the right to counsel, our cases have come to recognize certain limitations on a defendant's right to self-representation. A defendant may not invoke the *Faretta* right if the *Faretta* demand is untimely, equivocal, made for the purpose of delay, or is not knowingly and intelligently made. *See United States v. Schaff,* 948 F.2d 501, 503 (9th Cir.1991). Moreover, the Supreme Court has limited *Faretta* in material respects in the years since it was decided. Last Term, the Court held that *Faretta* does not extend to a criminal defendant on direct appeal from a criminal conviction. *See Martinez v. Court of Appeal of California,* 528 U.S. 152, 120 S.Ct. 684, 687, 145 L.Ed.2d 597 (2000). In the trial context, the Court has held that there is no absolute bar to standby counsel's unsolicited participation in a trial of a self-representing defendant. *See McKaskle v. Wiggins,* 465 U.S. 168, 176–77, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984). In *McKaskle,* the petitioner claimed "that the *Faretta* right will be eviscerated if [court-appointed standby] counsel is allowed to argue with the defendant, make motions to the court contrary to the defendant's wishes, and take other steps not specifically approved by the defendant." *Id.* at 177, 104 S.Ct. 944. He urged the Court to adopt the Fifth Circuit's rule "that court-appointed standby counsel is to be seen, but not heard." *Id.* at 173, 104 S.Ct. 944 (internal quotation marks omitted). The Court rejected those arguments.

■ Thus, in light of the disfavored status the right to self-representation enjoys vis-a-vis the right to counsel, there is no rule that a defendant who has once expressed a desire for self-representation must be cautioned or addressed personally before receiving the assistance of counsel. The law is to the contrary. It is the defendant who wishes to waive counsel who must be addressed personally before being permitted to represent him or herself. *See Faretta,* 422 U.S. at 835, 95 S.Ct. 2525; *United States v. Arlt,* 41 F.3d 516, 520 (9th Cir.1994). This colloquy enables the trial court to advise the defendant of the numerous benefits of counsel and attendant pitfalls of self-representation. *See Faretta,* 422 U.S. at 835, 95 S.Ct. 2525. After engaging in this discussion with the defendant, the trial court should not then be put in the position of suggesting even indirectly to a criminal defendant that he or she would benefit from self-representation. Yet such a suggestion would be difficult to avoid if the trial court were required to question a criminal defendant personally as to whether he or she really wanted to retain the assistance of counsel, despite counsel's statements that the de-

fendant had withdrawn a *Faretta* request. The trial court therefore did not err in accepting, without personally addressing Sandoval, defense counsel's representation that Sandoval would accept library privileges in lieu of self-representation.

■ Another Circuit has already expressly recognized this principle. In *Brown v. Wainwright*, the former Fifth Circuit found that once defendants appear through their attorneys the law does not require the court to inform defendants personally of their right to represent themselves. 665 F.2d at 612. The *Brown* court specifically rejected the claim that a trial judge is constitutionally required to engage in a personal colloquy with the defendant to ensure that the defendant has knowingly and voluntarily withdrawn his or her *Faretta* demand. *Id.* We agree with that court that, while advisable in some cases, a personal dialogue between the court and the defendant is not re-quired where circumstances indicate that the defendant has changed his or her mind about self-representation. *See id.*

## PROSECUTORIAL INVOCATION OF GOD'S AUTHORITY

At the close of the penalty phase trial, the prosecutor argued to the jury that the death penalty was sanctioned by God.[1] His argument paraphrased Romans 13:1–5, a passage from the Bible's New Testament commonly understood as providing justification for the imposition of the death penalty. *See* Robert Parham, *Please Stop Using the Scriptures as Rationale for Capital Punishment, The Tennessean,* Apr. 13, 2000; Larry Swindell, *Capital Idea: A Persuasive Examination-and Denunciation-on the Death Penalty, Fort Worth Star–Telegram,* Nov. 23, 1997; Robert Marquand, *Death Penalty Issue Stirs Divergent Religious Views, McVeigh Case Inspires Debate on Moral Aspects of Society's Ultimate Sanction, Christian*

---

1. The prosecutor argued:

 I want to respond to some of the things argued by [defense counsel]. He told you that it's absurd to talk about life and death, that the law is absurd, that you are playing God, that it's revenge.

 And that is to get you, of course, to vote for life without the possibility of parole. Well, death is a legitimate means of punishment in this state. It's available in this state. You are called upon to impose it if you think it's appropriate. You are a cross section of the community. People are judged by a jury of their peers. You make that determination whether the defendant should get the death penalty or life without the possibility of parole. The defense wants to make that burdensome for you. Each and everyone of you from here on must live with that decision. Push that button over there. You must live with that decision for the rest of your life.

 Well, if it wasn't you called upon to carry out the will of the people of the state of California, it would have been another jury, because that's our system. That's how the law is affected [sic] in this state.

 Don't once think that you have to feel burdened and depressed because I voted for death. You are doing what the law says if it's substantial, the aggravation substantially outweighs the mitigation. Don't listen to this lawyer talk.

 You will hear lingering doubt. You will hear other antics and whatever [defense counsel] is going to come up with [in rebuttal]. I won't be responding probably, but you can't lose focus. Don't feel guilty about what your decision is.

 *[Defense counsel] says don't play God. Let every person be in subjection to the governing authorities for there is no authority except from God and those which are established by God. Therefore, he who resists authority has opposed the ordinance of God, and they who have opposed will receive condemnations upon themselves for rulers are not a cause of fear for good behavior, but for evil. Do you want to have no fear of authority? Do what is good and you will have praise for the same for it is a minister of God to you for good. But if you do what is evil, be afraid for it does not bear the sword for nothing for it is a minister of God an avenger who brings wrath upon one who practices evil.*

 *You are not playing God. You are doing what God says. This might be the only opportunity to wake him up. God will destroy the body to save the soul. Make him get himself right.* ·

 *... Don't be fooled by what's to come [in defense's rebuttal]. Let him have the opportunity to get his soul right. That's the only way to get his attention. You are not playing God. God ordains authority.*

*Science Monitor,* June 12, 1997. The prosecutor told the jurors that God sanctioned the death penalty for people like Sandoval who were evil and have defied the authority of the State. He explained that by sentencing Sandoval to death, the jury would be "doing what God says." The prosecutor added that imposing the death penalty and destroying Sandoval's mortal body might be the only way to save Sandoval's eternal soul.

■ Sandoval claims that the prosecutor's use of this argument denied him a fair penalty phase trial. We agree with Sandoval that the argument was both improper and highly prejudicial.

■ The prosecutor's argument frustrated the purpose of closing argument, which is to explain to the jury what it has to decide and what evidence is relevant to its decision. *See United States v. Iglesias,* 915 F.2d 1524, 1529 (11th Cir. 1990). The jury's decision is to be based upon the evidence presented at trial and the legal instructions given by the court. *See Chandler v. Florida,* 449 U.S. 560, 574, 101 S.Ct. 802, 66 L.Ed.2d 740 (1981) ("Trial courts must be especially vigilant to guard against any impairment of the defendant's right to a verdict based solely upon the evidence and the relevant law."). Argument urging the jury to decide the matter based upon factors other than those it is instructed to consider is improper. We have therefore condemned argument that is inflammatory or appeals to bias or prejudice. *See e.g., Bains v. Cambra,* 204 F.3d 964, 974–75 (9th Cir.2000) (finding that the prosecutor's inflammatory argument invited the jurors "to give into their prejudices and to buy into the various stereotypes that the prosecutor was promoting"); *see also Cunningham v. Zant,* 928 F.2d 1006, 1020 (11th Cir.1991) (noting that the prosecutor's comparison of the defendant to Judas Iscariot and other comments improperly appealed to the jury's passions and prejudices and sought to inflame and misinform the jury); ABA Standards for Criminal Justice § 3–5.8(c)–

(d) (3d ed. 1993) ("The prosecutor should not make arguments calculated to appeal to the prejudices of the jury ... [and] should refrain from argument which would divert the jury from its duty to decide the case on the evidence."). Similarly, any suggestion that the jury may base its decision on a "higher law" than that of the court in which it sits is forbidden. *See Jones v. Kemp,* 706 F.Supp. 1534, 1558–59 (N.D.Ga.1989); *Commonwealth v. Chambers,* 528 Pa. 558, 599 A.2d 630, 644 (1991). The obvious danger of such a suggestion is that the jury will give less weight to, or perhaps even disregard, the legal instructions given it by the trial judge in favor of the asserted higher law.

■ In a capital case like this one, the prosecution's invocation of higher law or extra-judicial authority violates the Eighth Amendment principle that the death penalty may be constitutionally imposed only when the jury makes findings under a sentencing scheme that carefully focuses the jury on the specific factors it is to consider in reaching a verdict. *See Godfrey v. Georgia,* 446 U.S. 420, 428, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980) (holding that capital sentencing statutes must "channel the sentencer's discretion by clear and objective standards that provide specific and detailed guidance, and that make rationally reviewable the process for imposing a sentence of death") (internal citations and quotation marks omitted). The Biblical concepts of vengeance invoked by the prosecution here do not recognize such a refined approach. *See Jones,* 706 F.Supp. at 1559–60; *cf. Tison v. Arizona,* 481 U.S. 137, 180–81, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987) (Brennan, J., dissenting) (noting the "crude proportionality of 'an eye for an eye'"); *Coker v. Georgia,* 433 U.S. 584, 620, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977) (Burger, C.J., dissenting) ("As a matter of constitutional principle, [the Eighth Amendment proportionality] test cannot have the primitive simplicity of 'life for life, eye for eye, tooth for tooth.'").

Argument involving religious authority also undercuts the jury's own sense of responsibility for imposing the death penalty. The Supreme Court has disapproved of an argument tending to transfer the jury's sense of sentencing responsibility to a higher court. *See Caldwell v. Mississippi,* 472 U.S. 320, 330–34, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985) (holding that a prosecutor's argument that the jury's capital sentencing decision was not final because it would be reviewed by an appellate court unconstitutionally encouraged the jury to delegate its feeling of responsibility for the defendant's sentence to the appellate court). A fortiori, delegation of the ultimate responsibility for imposing a sentence to divine authority undermines the jury's role in the sentencing process.

For these reasons, religious arguments have been condemned by virtually every federal and state court to consider their challenge. *See Coe v. Bell,* 161 F.3d 320, 351 (6th Cir.1998); *Bennett v. Angelone,* 92 F.3d 1336, 1346 (4th Cir.1996); *Cunningham,* 928 F.2d at 1019–20; *United States v. Giry,* 818 F.2d 120, 133 (1st Cir. 1987); *Chambers,* 599 A.2d at 644; *People v. Eckles,* 83 Ill.App.3d 292, 38 Ill.Dec. 934, 404 N.E.2d 358, 365 (1980); *State v. Wangberg,* 272 Minn. 204, 136 N.W.2d 853, 854–55 (1965).

Our nation's courts are not alone in rejecting religious argument. The Ontario Court of Appeal has as well. The Canadian Constitution does not recognize the separation of church and state. *See e.g.* Canadian Constitution Act of 1982, Part 1, Canadian Charter of Rights and Freedoms ("Whereas Canada is founded upon principles that recognize the supremacy of God and the rule of law . . . . " ). Yet the Canadian court found counsel's references to Biblical stories to be "inappropriate in the extreme." *R. v. Finta,* [1992] 53 O.A.C. 1, 1992 Carswell Ont. 96 at ¶ 250.

 We thus agree with the Supreme Court of California's own conclusion that the prosecutor's argument in this case was improper and was not merely fair response to comments in defense counsel's closing argument. Defense counsel used the phrase "playing God" and referred to "an eye for an eye" in the context of a secular argument against vengeance.[2] Defense counsel did not invoke religious authority to support the result he advocated.

**2.** In relevant part, defense counsel stated:

Revenge? That's really what we're talking about. When you convicted Mr. Sandoval of these four murders and found the special circumstances to be true, you already guaranteed one thing. Fred Sandoval will die in the penitentiary is one of them in the state of California. Period. He will never come out. He will die in the penitentiary.

The question is is he going to die whatever it is in three years in the gas chamber or is he going to die of old age in the pen or is he going to die because someone stabs him in the back in the penitentiary? But the reality is that he is going to die in the penitentiary. That's already been decided and you decided that.

And in facing you again and thinking about that and thinking about how hard your job is, how difficult your job is, in reality you could sit, play God to an individual. I have to look you in the eye again and I want to know. I have been waiting. I respect your decision.

. . . . .

I have come to grasp it now. I looked at you in the eye an you can look back at me. Doesn't change anything. Nothing will bring back Anthony Aceves and Gilbert Martinez and the two Wells. Nothing. Won't change. Bottom line is revenge. Just pure and simple. Vengeance.

If that's what you want, that's what you feel, push the button. An eye for an eye, a tooth for a tooth, a stripe for a stripe, a life for a life.

. . . . .

He has a chance for doing some good. Anything that you do. I don't think society requires revenge. I don't think that you require revenge. An eye for an eye.

Ghandi said we do this eye for an eye thing, make society require it and do it, what happens is the whole world becomes blind. The light is shut out. That's not right. Don't shut out the light. Don't make the world blind. Don't push that button.

Our finding of constitutional error does not end the inquiry, however. To warrant habeas relief, Sandoval must show that the prosecutor's improper argument " 'had [a] substantial and injurious effect or influence in determining the jury's verdict.' " *Brecht v. Abrahamson*, 507 U.S. 619, 638, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). The prosecutor's allusion to Scripture must have prejudiced Sandoval's chances of receiving life without possibility of parole instead of the death penalty.

While we agree with the California Supreme Court that the prosecutor's argument was improper, we disagree with the majority's conclusion that the argument was harmless. We need not decide whether a prosecutor's invocation of religious authority during the penalty phase of a capital case is prejudicial per se, as at least one state court has held. *See Chambers*, 599 A.2d at 644; *see also* Brian C. Duffy, Note, *Barring Foul Blows: An Argument for a Per Se Reversible–Error Rule for Prosecutors' Use of Religious Arguments in the Sentencing Phase of Capital Cases*, 50 Vand. L.Rev. 1335 (1997) (arguing that a per se reversible error rule is required when prosecutors invoke religious authority to a jury in support of the death penalty because the traditional contextual analysis underestimates the prejudicial effect and discounts the constitutional nature of the misconduct). *But see* Elizabeth A. Brooks, Note, *Thou Shalt Not Quote the Bible: Determining the Propriety of Attorney Use of Religious Philosophy and Themes in Oral Arguments*, 33 Ga. L.Rev. 1113 (1999) (claiming that a per se prejudice rule is unworkable and undesirable). We conclude that the prosecutor's remarks actually prejudiced Sandoval.

We examine the likely effect of the statements in the context in which they were made. *See Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974); *Bennett*, 92 F.3d at 1346–47. The prosecutor's language in this case was eloquent, powerful, and unmistakably Biblical in style. The core of his remarks bears repeating here:

> Let every person be in subjection to the governing authorities for there is no authority except from God and those which are established by God. Therefore, he who resists authority has opposed the ordinance of God, and they who have opposed will receive condemnations upon themselves for rulers are not a cause of fear for good behavior, but for evil. Do you want to have no fear of authority? Do what is good and you will have praise for the same for it is a minister of God to you for good. But if you do what is evil, be afraid for it does not bear the sword for nothing for it is a minister of God an avenger who brings wrath upon one who practices evil.

This was strong medicine. The lay juror would readily understand the words as referring to Scripture. The message was clear: those who have opposed the ordinance of God should fear the sword-bearing state, whose task, as an avenging minister of God, is to bring wrath upon those who, like Sandoval, practice evil.

Those learned in the New Testament would recognize the argument as closely following the thirteenth chapter of the Book of Romans. The chapter reads in relevant part:

> *Submission to the Authorities*
>
> 1 Everyone must submit himself to the governing authorities, for there is no authority except that which God has established. The authorities that exist have been established by God.
>
> 2 Consequently, he who rebels against the authority is rebelling against what God has instituted, and those who do so will bring judgment on themselves.
>
> 3 For rulers hold no terror for those who do right, but for those who do wrong. Do you want to be free from fear of the one in authority? Then do what is right and he will commend you.

4 For he is God's servant to do you good. But if you do wrong, be afraid, for he does not bear the sword for nothing. He is God's servant, an agent of wrath to bring punishment on the wrongdoer.

5 Therefore, it is necessary to submit to the authorities, not only because of possible punishment but also because of conscience.

13 *Romans* 1–5 (NIV Study Bible 10th Anniversary Ed.).

Having thus cloaked the State with God's authority, the prosecutor then referenced the words used by defense counsel and refuted them by further invocation of religious command: "You are not playing God. You are doing what God says. This might be the only opportunity to wake him up. God will destroy the body to save the soul. Make him get himself right. . . . Let him have the opportunity to get his soul right. That's the only way to get his attention. You are not playing God. God ordains authority."

There could be no clearer an invocation of divine authority to direct a jury's verdict. Defense counsel objected to the argument, but the objection was overruled and no curative instruction given.

This is not a case where the evidence overwhelmingly supported the jury's verdict. The issue was life or death and the jury was sharply divided. After over three days of deliberations, the jury informed the trial judge that it was hopelessly deadlocked. It was divided 6–6 on two of the counts and 7–5 on the other two. In response to the judge's question whether the jury could possibly reach a result if it deliberated further or perhaps had portions of the transcript read back to it, each juror individually answered "no." Upon being returned to its deliberations, the jury took only an hour and forty minutes to go from a deadlock to four unanimous verdicts.

We do not know what actually happened in the jury room, but we cannot assume that the prosecutor's religious argument did not persuade at least one of the jurors to change a vote for life to death on the Marlene Wells count. The evidence in aggravation was countered with considerable mitigating evidence. That the jury deadlocked evenly after deliberating over three days exemplifies the difficulty of the sentencing decision.

The State argues that a finding of prejudice here would be out of step with cases from our sister circuits that have considered similar prosecutorial argument to be harmless error. There is no discord, for the cases are very record-specific.

In *Bennett v. Angelone*, for example, the Fourth Circuit held that a prosecutor's religious argument was error, but that, in light of the total context of the trial, the error did not render the defendant's trial unfair. 92 F.3d at 1346. In that case, the prosecutor told the jury that " 'Thou shall [sic] not kill' is a proscription against an individual; it is not against Government. Because Government has a duty to protect its citizens." *Id.* (sic in original). The court found that religious arguments were improper but held that the prosecutor's comments did not deny the defendant due process because there was strong evidence of the defendant's guilt and eligibility for the death penalty. *See id.* In that case the defendant's guilt trial lasted one day and defense counsel put on no evidence. *See id.* at 1341. After the penalty phase, the jury took less than an hour to return a death sentence. *See id.* Sandoval's trial was considerably longer and more complex, with the jury deliberating for over three days before reaching a verdict.

In *Coe v. Bell*, the Sixth Circuit held that argument that the Bible condones capital punishment was inappropriate, but that it did not in and of itself constitute reversible error. 161 F.3d at 351. The court did not explain why, but we observe that the prosecutor in that case did not argue that the Bible commanded capital punishment for the defendant. *See id.*

The First Circuit in *United States v. Giry,* held that the prosecutor's comparison of the defendant's testimony to "Peter who for the third time denied Christ" was improper, but that its prejudicial impact was significantly reduced by the trial judge's instructions and the strength of the evidence against the defendant. 818 F.2d at 132–34. *Giry* was not a capital case and defense counsel did not contemporaneously object to the prosecutor's statements. *Id.* at 122–23, 133.

The prosecutor in this case, although reminding the jury on various occasions that its duty was to determine whether the evidence in aggravation substantially outweighed the mitigating evidence and to follow the trial court's instructions, clearly intended to appeal to religious authority and did so repeatedly. The prosecutor meant this argument to have an effect on the jury. We think it did. At a minimum, we have grave doubts about the harmlessness of the error and therefore grant relief. *See Jeffries v. Wood,* 114 F.3d 1484, 1489 (9th Cir.1997) (en banc) ("Where the record is so evenly balanced that a conscientious judge is in grave doubt as to the harmlessness of an error, the error is not harmless and relief should be granted.").

## DENIAL OF LEAVE TO AMEND

■ We also have considered Sandoval's claim that the district court erred in denying his motion to vacate its order striking previously unexhausted claims from his habeas petition, or alternatively for an order granting leave to amend his petition to re-raise newly-exhausted claims. We have reviewed the record and find no abuse of discretion by the district court. *See Bonin v. Calderon,* 59 F.3d 815, 845–46 (9th Cir.1995).

## CONCLUSION

We hold that the district court erred in concluding that Sandoval was prejudiced by the trial court's failure to sever the trial on the Marlene Wells murder count from the other counts in the indictment. Severance was not required. We also reject Sandoval's claim that his *Faretta* right to self-representation was improperly denied.

Because the prosecutor's religion-based closing argument denied Sandoval a fair penalty phase trial, we remand the case to the district court with instructions to grant the petition for a writ of habeas corpus as to Sandoval's death sentence unless the State grants Sandoval a new penalty phase trial on the Marlene Wells count within 120 days of the district court's order. In light of our disposition of this issue, we need not address Sandoval's claim that the trial judge should have declared a mistrial after the jury deadlocked, or his claim that he was denied the effective assistance of counsel by his attorneys' failure to discover and present psychological evidence in mitigation at the penalty trial.

The judgment of the district court granting the writ as to Sandoval's conviction for Marlene Wells's murder is REVERSED. The district court's grant of the writ as to Sandoval's death sentence is AFFIRMED on the grounds of improper prosecutorial argument. The district court's judgment denying relief from Sandoval's other convictions and sentences is AFFIRMED. The case is REMANDED to the district court for entry of an appropriate order for a penalty phase retrial on the Marlene Wells count, if the State elects to seek such a retrial.

FISHER, Circuit Judge, dissenting in part:

I agree with all of the majority opinion, except its resolution of Sandoval's self-representation claim. I, too, believe that, by necessity, the Sixth Amendment right to self-representation is looked upon as the weaker corollary of the Sixth Amendment right to counsel. In this case, however, we are not called upon to determine whether this somewhat disfavored right was asserted in the first instance (thereby foregoing the all-important right to counsel); rather, we must decide whether Sandoval *waived*

his constitutionally protected right of self-representation once it was asserted.

Even if waiver under such circumstances is accomplished more easily than is waiver of the otherwise self-executing right to counsel, a finding of waiver calls for a *fact-specific* inquiry. The cases relied upon by the majority teach us this lesson. For example, in *Brown v. Wainwright*, 665 F.2d 607 (Former 5th Cir.1982) (en banc), the defendant's Sixth Amendment claim was denied *after an evidentiary hearing* had been held and all of the facts had been considered by the district court. *See id.* at 616 (Garwood, J., concurring) ("I wish ... to emphasize that following an evidentiary hearing the federal district court has found on the basis of adequate evidence that Petitioner, after the requests and motion to represent himself were made and before any ruling thereon by the state trial judge, resolved his differences with his appointed counsel...."). Likewise, the Supreme Court, in *McKaskle v. Wiggins*, 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984), denied the petitioner's Sixth Amendment claim only after conducting an exhaustive review of the trial transcripts, *see id.* at 180–87, 104 S.Ct. 944, and finding, on a factual basis, that "[t]he record ... reveal[ed] that [the petitioner's] pro se efforts were undermined primarily by his own, frequent changes of mind regarding counsel's role," *id.* at 182, 104 S.Ct. 944.

The problem in this case is that the facts are not as clear or developed as they were in the cases relied upon by the majority. The judge who denied Sandoval's motion was not the judge who first considered the motion and lectured Sandoval regarding the dangers of the route he was choosing. It appears from the record that the new judge was unaware of the motion and, of greater concern, the fact that Sandoval distrusted his counsel, *cf. Brown*, 665 F.2d at 612 ("In the present case, since there was no allegation by defendant that he did not trust his counsel or that counsel was incompetent, the judge had no reason to conclude counsel was misrepresenting defendant's views."). It also appears that Sandoval was unable to hear the representations made by counsel to the new judge at sidebar, so he had no opportunity to correct those representations if they were inaccurate. In addition, Sandoval contends that he was told that his motion had been denied and that library privileges had been granted in light of that denial, *not* that counsel had presented the judge with both options and that the judge had chosen library privileges "to prevent another pro per," which is what really occurred. If all of these facts were to prove true, one can hardly fault Sandoval for failing to reassert his right to self-representation or to challenge the trial court's denial of his original motion.

I understand the majority's concern that we must avoid encouraging a defendant to waive his or her right to counsel. That being said, however, I see no reason to caution *against* direct discussion between a court and a defendant upon withdrawal of a *Faretta* motion. I suggest that the facts of this case (particularly the judge's unfamiliarity with the motion and Sandoval's expressed distrust of his counsel) warranted such a discussion to ensure that Sandoval had in fact waived his Sixth Amendment right to act as his own counsel. All of the uncertainty surrounding Sandoval's waiver could have been clarified by the trial court without much additional time or effort, simply by addressing Sandoval directly.

Nor, as the majority seems to suggest, is a direct colloquy the only way to ensure that a defendant's Sixth Amendment right of self-representation is accorded due respect under these circumstances. I would not be writing this dissent if, for example, counsel had stated in open court that Sandoval would be satisfied with library privileges and Sandoval failed to object to the accuracy of that statement when made. Under those circumstances, it would have been unnecessary for the trial court to address the defendant directly. In fact, even if the trial court simply had denied

Sandoval's motion in open court following the discussion at sidebar, Sandoval would have been put on notice *on the record* of the basis for that denial and we would be able to infer from his silence that counsel had accurately relayed his position.[1] Unfortunately, neither of these approaches was taken at Sandoval's hearing.

We must also remember the posture of this issue on appeal. The district court denied Sandoval's Sixth Amendment claim by granting *judgment on the pleadings.* Because this is a pre-AEDPA case, we review de novo and Foster is entitled to relief if the trial court committed an error that had a substantial influence on the outcome of his trial. *See Lopez v. Thompson,* 202 F.3d 1110, 1116 (9th Cir.2000) (en

banc). Under this standard, I believe the circumstances of Sandoval's waiver merited an evidentiary hearing. *Cf. Schell v. Witek,* 218 F.3d 1017, 1027 (9th Cir.2000) (en banc) ("Evidentiary hearings are particularly appropriate when claims raise facts that occurred ... off the record.").

For these reasons, I would remand for an evidentiary hearing. I therefore dissent from the majority's determination of Sandoval's self-representation claim.

---

1. I do not suggest the record indicates that Sandoval's counsel intended to mislead the trial court. It may be the case that counsel misunderstood Sandoval. Or perhaps Sandoval *was* satisfied with library privileges and the appeal of this issue amounts to much ado about nothing. This is the information I would expect an evidentiary hearing to develop.