**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| MAUREEN MCDERMOTT, | No. 17-99005 |
| *Petitioner-Appellant*, | D.C. No. 2:04-cv-00457-DOC |
| v. | |
| DEBORAH K. JOHNSON, Warden, Central California Women's Facility, | OPINION |
| *Respondent-Appellee*. | |

Appeal from the United States District Court
for the Central District of California
David O. Carter, District Judge, Presiding

Argued and Submitted June 20, 2023
Seattle, Washington

Filed October 26, 2023

Before: Kim McLane Wardlaw, Ronald M. Gould, and
Michelle T. Friedland, Circuit Judges.

Opinion by Judge Wardlaw

## SUMMARY[*]

### Habeas Corpus / Death Penalty

The panel affirmed the district court's denial of Maureen McDermott's 28 U.S.C. § 2254 habeas corpus petition challenging her California conviction and death sentence for attempted murder and first-degree murder.

In the petition, McDermott argued, *inter alia*, that the prosecutor committed prejudicial misconduct during penalty-phase closing arguments by referencing Biblical verses to persuade the jury to impose a death sentence. Applying the extremely deferential standard required by the Antiterrorism and Effective Death Penalty Act (AEDPA), the panel affirmed the district court's denial of that claim because the state court habeas decision was not contrary to "clearly established Federal law, as determined by the Supreme Court of the United States."

The panel granted a Certificate of Appealability (COA) as to McDermott's claim that the prosecutor improperly used peremptory challenges in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986). After conducting a comparative juror analysis, the panel concluded that, under AEDPA's deferential standard of review, the California Supreme Court's finding that the trial court did not err in determining there was no purposeful discrimination was an objectively reasonable determination of the facts.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel denied COAs as to McDermott's remaining ineffective assistance of counsel claims.

## COUNSEL

Lauren Collins (argued) and Michael D. Weinstein, Assistant Federal Public Defenders; Hilary Potashner and Cuauhtemoc Ortega, Federal Public Defenders; Amy Karlin, Interim Federal Public Defender; John S. Crouchley, Attorney; Federal Public Defender's Office, Los Angeles, California; for Petitioner-Appellant.

Seth P. McCutcheon (argued), Douglas L. Wilson, A. Scott Hayward, John Yang, and Xiomara Costello, Deputy Attorneys General; Ronald S. Matthias, Senior Assistant Attorney General; Xavier Becerra, California Attorney General; California Attorney General's Office, Los Angeles, California; for Respondent-Appellee.

## OPINION

WARDLAW, Circuit Judge:

On April 3, 1990, Maureen McDermott was sentenced to death after a California jury found her guilty of attempted murder and first-degree murder of Stephen Eldridge, finding true the special circumstances of lying in wait and murder for financial gain. McDermott now appeals the district court's denial of her 28 U.S.C. § 2254(d) habeas petition.

In her federal habeas petition, McDermott argues, *inter alia*, that during trial the prosecutor committed prejudicial

misconduct during penalty-phase closing arguments by quoting the Bible. Because the state court habeas decision was not contrary to "clearly established Federal law, as determined by the Supreme Court of the United States," Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254(d), we affirm the district court's denial of McDermott's prosecutorial misconduct claim.

Further, we grant a Certificate of Appealability ("COA") as to McDermott's claim that the prosecutor improperly used peremptory challenges in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986), but nevertheless affirm the district court's denial of habeas relief on that claim. Finally, we deny COAs as to McDermott's remaining ineffective assistance of counsel claims.

## I.

On April 28, 1985, Stephen Eldridge was stabbed to death in the home he shared with McDermott. *People v. McDermott*, 28 Cal. 4th 946, 962–66 (2002). McDermott hired Jimmy Luna, McDermott's former coworker and friend, to murder Eldridge. Luna, in turn, hired the brothers Marvin and Dondell Lee to assist him. The three jointly stabbed Eldridge to death on April 28, 1985.

At the time of the murder, McDermott was a 37-year-old registered nurse working at Los Angeles County-USC Medical Center during the day, while providing nursing care to an individual named Lee LaPorte at his home in the evening. Eldridge was a 27-year-old self-employed landscaper. Eldridge and McDermott lived together in a home that they owned as joint tenants. In December 1984, McDermott and Eldridge each bought $100,000 in life insurance, designating the other as the sole beneficiary. In

early 1985, McDermott and Eldrige's relationship deteriorated.

Near the end of February 1985, McDermott and Luna planned Eldridge's murder. McDermott told Luna that she was the beneficiary of Eldridge's insurance policy and offered him $50,000 to kill Eldridge. Luna agreed. McDermott told Luna that she wanted Eldridge stabbed because a gun would make too much noise and that she wanted the murder to look like a "homosexual murder" so that the police would not investigate it as vigorously as other killings.

On three occasions, McDermott arranged for Luna to be in the house with Eldridge to facilitate the murder; however, each time Luna became frightened and did not carry out the plan. McDermott then suggested that Luna find someone to assist him.

In March 1985, Luna asked his friend Marvin Lee to help him commit the murder. He offered Marvin $3,000, and Marvin agreed. On March 21, 1985, Luna and Marvin attempted to kill Eldridge, threatening him with a knife, cutting his buttocks and yelling homosexual epithets. Again, the murder attempt failed. Eldridge ran away, and Luna and Marvin left. Eldridge was taken by ambulance to a hospital for treatment.

After the failed murder attempt, McDermott and Luna spoke on several occasions during which they discussed the plan to kill Eldridge and what they would do with the anticipated insurance proceeds.

On April 28, 1985, Luna met with Marvin and Marvin's brother Dondell Lee. Luna offered Dondell money to help commit the murder. Luna then called McDermott, and they

once again discussed the plan: McDermott would leave a front bedroom window open for them to enter the house, and Luna would tie her up so that it looked as if she was a robbery victim.

When Eldridge arrived home, Dondell met him with a rifle (owned by McDermott and provided to him by Luna). Marvin then grabbed Eldridge by the neck in a chokehold and Luna stabbed him repeatedly until he slumped to the floor. At McDermott's request, Luna also cut off Eldridge's penis.

The autopsy found that Eldridge had been stabbed 44 times and that his penis was severed postmortem. McDermott was arrested in August 1985 and charged with attempted murder, murder, and special circumstance allegations of murder for financial gain and lying in wait.

## II.

On March 2, 1990, a jury found McDermott guilty of attempted murder and first-degree murder of Eldridge, finding true the special circumstances of murder for financial gain and by means of lying in wait. On April 3, 1990, the jury returned a verdict of death.

McDermott's capital conviction was automatically appealed to the California Supreme Court ("CSC") under California state law. Cal. Const. art. VI; § 11; Cal. Penal Code § 1239. On August 12, 2002, the CSC affirmed McDermott's conviction and sentence. *McDermott*, 28 Cal. 4th at 1006. On October 30, 2002, the CSC modified its opinion, holding that the trial court did not violate McDermott's statutory rights or her right to due process. The United States Supreme Court denied certiorari. *McDermott v. California*, 538 U.S. 1014 (2003).

On November 8, 2000, McDermott filed her first state habeas petition in the CSC. On January 14, 2004, the CSC summarily denied the petition "on the merits."

On January 14, 2005, McDermott filed this federal habeas petition and simultaneously filed her second state habeas petition in the CSC. The district court granted McDermott's motion to stay the federal proceedings pending resolution of the state proceedings. On January 3, 2007, the CSC denied the second state habeas petition both on the merits and on procedural grounds.[1] The district court lifted the stay of the federal proceedings on January 25, 2007.

On March 23, 2007, McDermott filed the First Amended Petition ("FAP") in the federal habeas proceeding. On June 25, 2010, the district court granted an evidentiary hearing on several of McDermott's claims, but vacated the hearing after the Supreme Court issued its opinion in *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (holding that federal court review under § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits.").

On January 5, 2015, the district court denied on the merits the claims for which it had previously granted an evidentiary hearing and directed the parties to submit briefs addressing the merits of the remaining unadjudicated claims. On August 15, 2017, the court issued an order denying the remaining claims, but granting a COA on McDermott's prosecutorial misconduct claim. McDermott filed a motion to alter, amend, or vacate the judgment, asking the district court to permit further briefing on the procedural bar that formed the basis of its decision on the certified claim. On

---

[1] On August 10, 2007, McDermott filed a third state habeas petition. On May 21, 2008, the CSC denied the petition on the merits.

April 2, 2018, the district court denied the motion.
McDermott then filed a motion to expand the COA to
include her motion to alter, amend, or vacate the judgment,
which the district court denied on May 14, 2018.

### III.

We review de novo a district court's denial of habeas
relief. *Avena v. Chappell*, 932 F.3d 1237, 1247 (9th Cir.
2019). Because McDermott filed her federal habeas petition
after April 24, 1996, AEDPA applies to this case. 28 U.S.C.
§ 2254; *Murray v. Schriro*, 745 F.3d 984, 996 (9th Cir.
2014).

### IV.

### A.

The district court did not err in denying McDermott's
prosecutorial misconduct claim. McDermott argues that the
prosecutor committed misconduct during the penalty phase
closing argument by referencing Biblical verses to persuade
the jury to impose a death sentence. McDermott argues the
following statements were misconduct:

> Now, I'm [not] a biblical scholar. I don't
> know much about the Bible. But most
> biblical scholars, as I understand it, interpret
> the commandment "Thou shalt not kill" as in
> actually meaning "thou shall not commit
> murder."

> And there are in fact several references to the
> death penalty in the Bible. In Exodus 21,
> verse 12, the Bible states, "Whoever strikith
> [sic] a man a mortal blow must be put to
> death."

And in verse 14, which I would suggest to you is incredibly apropos for this situation, "When a man kills another [man] after maliciously scheming to do so, you must take him from my altar and put him to death."

McDermott did not raise a prosecutorial misconduct claim until her direct appeal. The CSC denied the claim in a reasoned decision, applying California's contemporaneous-objection rule. Citing to *People v. Hill*, 17 Cal. 4th 800, 820 (1998), the CSC stated that "a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety." *McDermott*, 28 Cal. 4th at 1001. The CSC also rejected McDermott's claim that her trial counsel was ineffective for not objecting to the alleged prosecutorial misconduct, explaining that "[b]ecause the record does not show the reasons for counsel's actions, defendant's claim of ineffective assistance is more appropriately decided in a habeas corpus proceeding." *Id.* at 1001–02.

McDermott reasserted the prosecutorial misconduct claim in her second state habeas petition. The CSC summarily denied the claim (1) "on the merits;" (2) as untimely; and (3) as successive because it had been raised and rejected on direct appeal. The CSC cited *In re Harris*, 5 Cal. 4th 813, 824–29 (1993), and *In re Waltreus*, 62 Cal. 2d 218, 225 (1965), in support of its summary denial.

McDermott argues on appeal that the CSC's denial of this claim was an unreasonable application of clearly established law. In response, the State argues primarily that the prosecutorial misconduct claim was procedurally

defaulted because defense counsel failed to object to the alleged misconduct at trial.

We disagree that McDermott's prosecutorial misconduct claim is procedurally barred. Although the prosecutorial misconduct claim was initially procedurally defaulted under the California contemporaneous objection rule, a procedural bar is removed "[i]f the last state court to be presented with a particular federal claim reaches the merits." *Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991).

Therefore, the parties dispute which of the state courts' decisions is "the last" state decision that resolved this claim on the merits for purposes of our review. *DeWeaver v. Runnels*, 556 F.3d 995, 997 (9th Cir. 2009) ("When reviewing a state court's analysis under AEDPA," we "look[] to the last reasoned decision as the basis for its judgment." (quotation marks omitted) (quoting *Forn v. Hornung,* 343 F.3d 990, 995 (9th Cir.2003))); *Ylst*, 501 U.S. at 805.

The CSC addressed the prosecutorial misconduct claim first on direct appeal and then again in response to McDermott's second state habeas petition. *McDermott*, 28 Cal. 4th at 1001. Because the second state habeas decision was a reasoned decision that denied McDermott's prosecutorial misconduct claim (referred to as "Claim 12") "on the merits," we must look to that decision for purposes of AEDPA.

The second state habeas decision also invoked procedural bars, alternatively denying the claim as untimely and successive under *In re Waltreus*, 62 Cal. 2d at 225. However, the State did not invoke those procedural bars in its briefings on this appeal, and therefore it has forfeited any reliance on them. *See Clark v. Chappell*, 936 F.3d 944, 982

(9th Cir. 2019). Because the CSC's merits determination in its second habeas decision removed the procedural bar that had applied on direct appeal, *see Ylst*, 501 U.S. at 801, McDermott now does not need to overcome any procedural bars to obtain habeas relief on the merits of the prosecutorial misconduct claim. *See Ayala v. Chappell*, 829 F.3d 1081, 1095 (9th Cir. 2016) (applying AEDPA deference to a state court's merits determination, even where the state court had, in the alternative, rejected the claim for procedural reasons).

Nonetheless, McDermott's prosecutorial misconduct claim fails because McDermott cannot overcome the high bar to relief established by AEDPA. Under AEDPA, a state prisoner whose claim has been "adjudicated on the merits" in state court cannot obtain federal habeas relief unless that adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2).

For purposes of AEDPA review, "clearly established Federal law" means the Supreme Court's holdings as of "the time of the state-court adjudication." *Greene v. Fisher*, 565 U.S. 34, 37 (2011); *Pinholster*, 563 U.S. at 182. A decision is "contrary to" the Supreme's Court's clearly established law if it "'applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [the Supreme Court's] precedent.'" *Price v. Vincent*, 538 U.S. 634, 640 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000)). A finding that a

state court erred in applying clearly established law is insufficient to show an "unreasonable application" of Supreme Court precedent. *Harrington v. Richter*, 562 U.S. 86, 101 (2011). Rather, "the question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

Accordingly, the "clearly established Federal law" standard is "difficult to meet, because the purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction." *Greene*, 565 U.S. at 43 (internal quotation marks omitted). Further, because here the state court habeas merits decision was unexplained, under AEDPA we must determine whether McDermott can show that "there was no reasonable basis for the state court to deny relief." *Harrington*, 562 U.S. at 98; *Pinholster*, 563 U.S. at 217–18 (Sotomayor, J., dissenting) (When a state court "summarily denies a claim without explanation," federal courts consider whether "there is any reasonable argument" supporting the denial of the petitioner's claim).

The CSC's denial of McDermott's prosecutorial misconduct claim is not contrary to clearly established Supreme Court precedent. Although a prosecutor's references to the Bible in closing argument in a capital case have been held unconstitutional as violative of the Eighth Amendment under our circuit precedent, *see Sandoval v. Calderon*, 241 F.3d 765, 776–77 (9th Cir. 2000), only Supreme Court precedent operates as "clearly established" law for AEDPA purposes. *See* 28 U.S.C. § 2254(d)(1); *Lopez v. Smith*, 574 U.S. 1, 7 (2014) (per curiam) (holding

that "[c]ircuit precedent cannot 'refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that [the Supreme] Court has not announced'" (quoting *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013))).

Indeed, the Supreme Court has never announced a rule about invocations of religious authority in a closing argument; it has only recited general principles about prosecutorial misconduct related to sentencing and the death penalty. McDermott relies on *Caldwell v. Mississippi*, in which the Supreme Court articulated the general principle that an argument that transfers the jury's notion of responsibility for its own verdict of death to another entity is impermissible. 472 U.S. 320, 328–29 (1985) ("[I]t is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere."). *Caldwell* held that a prosecutor's argument that the jury's capital sentencing decision was not final because it would be reviewed by an appellate court was improper because the argument encouraged the jury to delegate its feelings of responsibility to a higher court. *Id*. at 323.

McDermott also cites *Godfrey v. Georgia*, in which the Supreme Court affirmed that "the penalty of death may not be imposed under sentencing procedures that create a substantial risk that the punishment will be inflicted in an arbitrary and capricious manner." 446 U.S. 420, 427 (1980) (citing *Furman v. Georgia*, 408 U.S. 238 (1972)). In *Godfrey*, the Supreme Court concluded that the Georgia Supreme Court erred by affirming a death sentence based on a finding that the offense was "outrageously or wantonly vile, horrible and inhuman." *Id.* at 426. The Supreme Court clarified that the jury's decision must be "based on reason

rather than caprice or emotion." *Id*. at 433 (quoting *Gardner v. Florida*, 430 U.S. 349, 358 (1977)).

But neither of these Supreme Court opinions—nor any other Supreme Court decision—discusses the use of religious authority during closing arguments, or even the use of religious authority in general during trial. Accordingly, the only Supreme Court decisions binding the CSC in 2007 were the Supreme Court's general statements about the Eighth Amendment and due process. There was not then (and is not now) clearly established Supreme Court precedent holding that invoking religious principles generally or the Bible specifically during closing arguments violates the Constitution.

To be clear, we have no doubt that the prosecutor's references to quotations of Biblical verses during closing arguments were unconstitutional prosecutorial misconduct, and prejudiced McDermott. As we explained in *Sandoval*, "religious arguments have been condemned by virtually every federal and state court to consider their challenge." 241 F.3d at 777; *see also Roybal v. Davis,* 148 F. Supp. 3d 958, 1044 (S.D. Cal. 2015*)* ("It is well settled that biblical law has no proper role in the sentencing process.").

If we were reviewing de novo, we would conclude that the prosecutor's statements were unconstitutional, as we did in *Sandoval*. Invocations of religion by a prosecutor for sentencing purposes "cloak[] the State with God's authority," and thus improperly appeal to the passions and biases of jurors and divert the jury from its task. *Sandoval,* 241 F.3d at 776, 779. Moreover, such appeals are contrary to the principles of separation of church and state upon which this nation was founded. *See Everson v. Bd. of Educ.*, 330 U.S. 1, 16 (1947) ("In the words of Jefferson, the clause

against establishment of religion by law was intended to erect a wall of separation between Church and State." (internal quotation marks omitted)).

However, we are constrained by AEDPA and Supreme Court precedent. And under AEDPA's extremely deferential standard, the CSC's denial of McDermott's prosecutorial misconduct claim was not contrary to, or an unreasonable application of, Supreme Court precedent. *See Lopez*, 574 U.S. at 6 (holding that the Ninth Circuit erred by "rely[ing] heavily on its own decision" because no Supreme Court case law addressed "the specific question presented"). We therefore conclude that McDermott's prosecutorial misconduct claim fails under AEDPA.

## B.

In an uncertified claim, McDermott, who is white, argues that the prosecutor violated her Fourteenth Amendment rights by impermissibly using peremptory challenges to remove prospective jurors on the basis of race. *See Batson*, 476 U.S at 97. Specifically, McDermott contends that the prosecution violated *Batson* by improperly using eight of its twenty-four peremptory challenges to exclude Black venirepersons from the jury pool.

McDermott first brought a *Batson* motion during trial, after the prosecution struck eight Black prospective jurors.[2] The trial court found a prima facie showing of purposeful

---

[2] At the point when the trial court addressed McDermott's *Batson* objection, the prosecutor had exercised peremptory strikes against eight Black prospective jurors. The prosecution then struck a ninth Black individual, prospective alternate Isaac J. But McDermott's counsel did not reassert the *Batson* objection at that time. Thus, the decision to strike Isaac J. was not part of the totality of the circumstances the trial court considered when ruling on McDermott's *Batson* challenge.

discrimination, but ultimately denied the *Batson* motion, finding that with respect to each peremptory strike, there was "a reasonable relationship of the views expressed either in the questionnaire or orally by the prospective juror that has been excluded and the issues in this case."

The CSC denied McDermott's *Batson* claim in a reasoned opinion on direct appeal. *McDermott*, 28 Cal. 4th at 966–81. The CSC stated that "the trial court understood that the overriding reason for challenging the eight prospective jurors was the attitude of each toward the death penalty." *Id.* at 970. The CSC determined that substantial evidence supported the trial court's findings as to each prospective juror. *Id.* at 971–79.

McDermott again raises the *Batson* claim in her federal habeas petition. The district court determined that the trial court's credibility findings for the prosecutor's stated reasons "were reasonable in view of the record and the comparative juror analysis."

We may not review McDermott's *Batson* claim, which the district court declined to certify for appellate review, unless we grant a COA. 28 U.S.C. § 2253(c)(1)(A) ("Unless a . . . judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from . . . the final order in a habeas corpus proceeding."). To obtain a COA, McDermott "must show that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (*Miller-El I*) (internal quotation marks and alteration omitted).

On the factual record before us, we think that reasonable jurists could debate whether the prosecutor used the peremptory challenges to purposely discriminate against black jurors. "Courts frequently look to numeric evidence to detect impermissible discrimination, including the percentage of a particular group removed from the venire by the challenged strikes and the percentage of strikes directed against members of a particular group." *United States v. Mensah*, 737 F.3d 789, 797 (1st Cir. 2013) (internal quotation marks omitted). Here, the prosecutor struck nine out of twelve prospective Black jurors, i.e. 75 percent of the Black jurors, and used nine of her twenty-four peremptory challenges to strike Black jurors, i.e. 37.5 percent. Black jurors comprised only about 15 percent of the petit venire. As McDermott points out, the prosecutor "challenged Black jurors at a rate of more than twice the percentage of the Black prospective jurors in the jury pool." These numbers constitute some evidence of discriminatory purpose. *See Fernandez v. Roe*, 286 F.3d 1073, 1078 (9th Cir. 2002).

Indeed, when the twenty-five day jury selection concluded, a jury with no Black members was seated. The state trial court found that defense counsel had made a prima facie showing of purposeful discrimination, throwing the burden to the prosecutor to present a race-neutral explanation for each of the eight strikes. And no state court conducted a comparative analysis. ["I]n order for *us* to discharge our responsibility under AEDPA to review a Batson claim under section 2254(d)(2), we often will have to conduct a formal comparative juror analysis, and our responsibility to conduct a comparative juror analysis is not contingent on whether the state court previously performed or did not perform a formal comparative juror analysis." *Murray*, 745 F.3d at 1005; *see also Jamerson v. Runnels*, 713

F.3d 1218, 1225 (9th Cir. 2013) ("[W]e must perform in the first instance the comparative analysis that the state court declined to pursue.").

We therefore think that the *Batson* claim is reasonably debatable. Especially in light of the contrast between the number of Black potential jurors in the venire pool and the marked absence of *any* Black jurors on the seated jury, we grant a COA on McDermott's *Batson* claim. Nonetheless, after conducting a comparative juror analysis, we deny McDermott's *Batson* claim.

The Equal Protection Clause forbids the prosecution from challenging potential jurors on the basis of race. *Batson*, 476 U.S. at 89. Peremptory challenges based on race are prohibited even if, as in this case, the defendant is of a different race than the stricken jurors. *Powers v. Ohio*, 499 U.S. 400, 402 (1991). *Batson* established a three-step analysis to determine if this prohibition has been violated: First, a trial court must determine whether a defendant has made a prima facie showing of "purposeful discrimination," by considering whether the totality of the facts give rise to an inference of discriminatory purpose. *Batson*, 476 U.S. at 93–94. Second, if a prima facie showing is made, the burden shifts to the prosecutor to present a race-neutral explanation for striking the jurors. *Id.* at 97. Third, the court must determine whether the defendant has carried the burden of proving purposeful discrimination. *Id.* at 98.

Because there is no dispute that McDermott made a prima facie showing of purposeful discrimination and the prosecutor proffered ostensibly race-neutral reasons, the parties agree that this appeal turns on *Batson*'s third step. To meet her burden, McDermott "need not prove that all of the prosecutor's race-neutral reasons were pretextual, or even

that the racial motivation was 'determinative.'" *Currie v. McDowell*, 825 F.3d 603, 605 (9th Cir. 2016) (quoting *Snyder v. Louisiana*, 552 U.S. 472, 485 (2008)). She must demonstrate, however, that race was a "substantial motivating factor" in the prosecutor's exercise of at least one strike. *Id.* at 606. The third step requires a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Batson*, 476 U.S. at 93 (quoting *Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 266 (1977)). Moreover, the inquiry includes comparing the reasons given for striking a Black venireperson with the circumstances surrounding those non-Black venirepersons who remained on the jury panel. *Jamerson*, 713 F.3d at 1224 (citing *Briggs v. Grounds*, 682 F.3d 1165, 1170 (9th Cir. 2012)).

We must apply AEDPA deference to the CSC's determination affirming the trial court's finding of no purposeful discrimination.[3] We review the determination whether a prosecutor's strikes were purposefully discriminatory at *Batson*'s step three under 28 U.S.C. § 2254(d)(2), asking whether the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *See Sifuentes v. Brazelton*, 825 F.3d 506, 517 (9th Cir. 2016) ("Because the district court's determination whether the prosecutor's strikes were purposefully discriminatory is a 'pure issue of fact,' AEDPA § 2254(d)(2) applies."); *Rice v. Collins*, 546 U.S. 333, 338, 341 (2006) (reviewing a Batson third step analysis under § 2254(d)(2) and declining to consider § 2254(b)(1) because there was no allegation that

---

[3] The parties agree that CSC's opinion on direct appeal is the last reasoned state court decision on this issue.

the court misapplied the Batson framework). Under 28 U.S.C. § 2254(d), a state court finding that the prosecutor did not engage in purposeful discrimination is entitled to "a statutory presumption of correctness." *Currie v. McDowell*, 825 F.3d 603, 609 (9th Cir. 2016). Because the CSC applies deference to the trial judge's credibility determinations, our review on federal habeas is "doubly deferential." *Jamerson*, 713 F.3d at 1225. "This is because the question of discriminatory intent 'largely will turn on evaluation of credibility' and 'evaluation of the prosecutor's state of mind based on demeanor and credibility lies peculiarly within a trial judge's province.'" *Id*. (quoting *Hernandez v. New York*, 500 U.S. 352, 365 (1991)). Thus, unless the CSC was objectively unreasonable in concluding that the trial court's credibility determination at *Batson*'s third step was supported by substantial evidence, we must uphold the denial of the *Batson* claim. *See Briggs*, 682 F.3d at 1170 (citing *Rice*, 546 U.S. at 338–42).

Here, McDermott's contention that the CSC's decision to deny her *Batson* claims was an unreasonable determination of the facts is not supported by the record. We begin by analyzing the four jurors for whom the prosecutor provided specific justifications for striking. We then analyze the remaining four jurors for whom the prosecutor gave a general justification for using a peremptory challenge—that the jurors had expressed views disfavoring the death penalty. After conducting our own comparative analysis and "reevaluat[ing] the ultimate state decision in light of this comparative analysis and any other evidence tending to show purposeful discrimination," we conclude that the CSC was not "unreasonable in finding the prosecutor's race-neutral justifications to be genuine." *Jamerson*, 713 F.3d at 1225.

We examine the facts surrounding each exercise of the prosecution's peremptory challenge of the Black jurors in turn:

*1. Prospective Juror Keia M.*  The prosecution used a peremptory strike against potential juror Keia M., a nineteen-year-old Black woman without children, who lived with her boyfriend.  The prosecutor explained that her reason for using a peremptory strike against Keia M. was that Keia M. was not mature enough to consider whether a death sentence was warranted and because Keia M.'s views on the death penalty were not "thought out at all."

The CSC determined that the trial court's finding that Keia M. was not a good prosecution juror with respect to the death penalty was supported by the record because Keia M. initially "expressed the view that there was really no difference" between life without the possibility of parole ("LWOP") and the death penalty "in terms of severity." *McDermott*, 28 Cal. 4th at 978.

Both of the prosecutor's justifications for striking Keia M.—her immaturity and her death penalty views—are supported by the record.  Many of Keia M.'s answers in the jury questionnaire were vague or superficial.  For instance, Keia M. believed doctors were "not friendly enough"; lawyers had an "interesting job"; police had a "very hard job"; psychologists were "pushy"; and psychiatrists earned "easy money."  With regard to the death penalty in particular, her voir dire answers included statements like "I don't know if I can explain this."  While she stated that she thought society should have a death penalty, she struggled to name a crime that would merit it, saying "[t]here is nothing." Accordingly, the CSC reasonably concluded that substantial evidence supported the trial court's finding that the

prosecutor's stated rationale was not a pretext for racial discrimination. *Nguyen v. Frauenheim*, 45 F.4th 1094, 1103 (9th Cir. 2022) ("Lack of maturity and life experience are nondiscriminatory reasons for a peremptory strike.").

Furthermore, a comparison of Keia M. to the seated jurors and stricken white jurors supports the reasonableness of the CSC's determination that the prosecutor's justification was not pretextual. First, Keia M. was much younger than the seated jurors and the alternates. In addition, the youngest seated juror had provided more nuanced and specific answers in the questionnaire and elaborated on them during voir dire. Accordingly, a reasonable inference can be drawn that the prosecutor believed that jurors with life experiences and maturity would be better equipped to vote for the death penalty and not that the prosecutor was discriminating on the basis of race.

Given McDermott's burden of persuasion and the deference owed to the trial court's assessments of credibility, maturity and demeanor, the CSC's rejection of McDermott's *Batson* claim as to Keia M. was not based on an unreasonable determination of the facts. *See Rice*, 546 U.S. at 343 (Breyer, J., concurring) (observing that appellate courts "must[ ] grant the trial courts considerable leeway in applying *Batson*" because, "in a borderline case," the trial judge is best situated to decide if "a prosecutor's hesitation or contradiction reflect (a) deception, or (b) the difficulty of providing a rational reason for an instinctive decision").

**2. *Prospective Juror Theola J.*** The prosecution exercised a peremptory strike against potential juror Theola J., a fifty-nine-year-old, Black, divorced mother of five children, who had served as a postal worker for 20 years. The prosecution explained that its reason for using a

peremptory strike against Theola J. was that she was "very, very stupid;" she "couldn't see herself ever giving the death penalty"; and she was "as bad as you could get."

The CSC upheld the trial court's finding that the prosecutor could reasonably view Theola J. as having views on the death penalty that were unfavorable to the prosecution. *McDermott*, 28 Cal. 4th at 974–75. The CSC stated that "[a]lthough [Theola J.'s] responses were confused and inconsistent, and her final statements indicated neutrality on the death penalty, two of her answers could cause the prosecutor legitimate concern." *Id.* at 975.

The CSC did not make an unreasonable determination of the facts in concluding that the prosecution had race-neutral reasons for challenging Theola J. For example, when asked during voir dire whether she felt the State should have the right to execute someone found guilty of first degree premeditated, deliberate murder, Theola J. stated, "No. I don't think so." Further, Theola J.'s other responses implied that "she might enter the penalty phase with something like a presumption in favor of the alternate penalty of life without parole." *Id.* at 975. Moreover, in her juror questionnaire, Theola J. "failed to provide any meaningful responses to many of her questions," and others were "left blank." Both the trial court and the parties had to repeat questions to Theola J. several times, and they occasionally failed to obtain a clear answer from her even after multiple attempts. Therefore, Theola J.'s views on the death penalty and her perceived intelligence provided race-neutral reasons that the prosecutor exercised a peremptory strike against her.

That there was no purposeful discrimination in striking Theola J. is reinforced by a comparative analysis of Theola J. with seated and stricken jurors. For instance, McDermott

argues that seated juror Kathryn P. stated twice that she would need to be convinced that the death penalty was the appropriate punishment.  Kathryn P.'s questionnaire responses, however, were far more articulate than Juror Theola J.'s responses.

The record shows that the prosecutor had a reasonable basis to believe Theola J. lacked the intellectual capacity to understand and apply the law.  This, in combination with her negative views toward the death penalty, support the CSC's denial of McDermott's *Batson* claim as to Theola J.

***3. Prospective Juror Gerald W.***  The prosecution used a peremptory strike against potential juror Gerald W., a thirty-five-year-old Black, single male, with one child who had some college education and worked as a cashier.  The prosecutor justified her peremptory challenge against Gerald W. as follows: "[Gerald W.] said that he favored the death penalty only in situations if a person had a criminal record. That was his initial statement.  And then he changed his mind later.  He is in favor, if you look at his statement in the questionnaire, basically of rehabilitation and counseling before punishment such as the death penalty."

The CSC determined that the trial court's finding as to Gerald W. was supported by substantial evidence because "his answers suggested that in making the penalty determination he would be heavily influenced by the presence or absence of a prior criminal record and that at least initially he was not inclined to impose the death penalty on one who did not personally participate in the killing." *McDermott*, 28 Cal. 4th at 979.

The CSC's ruling as to juror Gerald W. is not an unreasonable determination of the facts.  The record shows that Gerald W. favored the death penalty only for the direct

killer and for repeat offenders. The prosecutor was reasonably concerned about jurors who favored the death penalty for those reasons because McDermott did not have a prior criminal record and did not herself commit the murderous act. For example, when Gerald W. was asked whether his ability to vote for the death penalty would be determined by a person's prior criminal record, he stated that "[i]t would have a lot to do with it," and that he did not think he could see himself voting for the death penalty in a situation where he found the person guilty for participation in the crime, but the person did not "pull[] the trigger." And "[a]lthough he later modified his answer, his initial pre-occupation with whether the defendant was the direct perpetrator, as well as his pre-occupation with the defendant's criminal history, supports the race-neutral reasons given by the prosecutor for" using a peremptory challenge against Gerald W.

A comparative juror analysis confirms that the CSC's rejection of this *Batson* claim was not unreasonable in light of the record. While a seated white juror, Kathryn P., expressed ambivalence about the death penalty, she did not state that she would have a hard time voting in favor of the death penalty for a person without a criminal record who did not personally participate in the murder.

*4. Prospective Juror Gilbert K*. The prosecution used a peremptory strike against potential juror Gilbert K., a forty-year-old, Black, married man without children who worked as an accountant. The prosecutor justified the strike on Gilbert K. as follows: "[Gilbert K.] stated that he would consider the death penalty if the crime was particularly brutal. But, and I have that underlined, he doesn't want the death penalty unless the defendant would kill again in prison.

And I didn't feel that was a realistic prospect for the defendant in this case."

The CSC determined that Gilbert K.'s "earlier responses, questioning the need to execute someone who posed little or no threat of violence in prison, could be a matter of legitimate concern to the prosecutor in this case." *McDermott*, 28 Cal. 4th at 973-74.

The CSC did not make an unreasonable determination in concluding that the prosecution had race-neutral reasons for exercising a peremptory strike against Gilbert K. Indeed, Gilbert K. stated that if he "did not feel the person would kill again" it was "very doubtful" that he could see himself voting for the death penalty. After further questioning, he modified his views, but the record supports the prosecutor's concern that Gilbert K. would not vote for the death penalty because there was no evidence that McDermott would likely kill again if sentenced to life without parole. In light of the record, the CSC's rejection of McDermott's *Batson* claims concerning Gilbert K. is not based on an unreasonable determination of the facts.

**5. *Prospective Juror Brenda B*.** The prosecution used a peremptory challenge against potential juror Brenda B., a forty-one-year-old divorced, Black woman, who is a registered Democrat, with children, and who identified as a "loner." The prosecution did not provide any particular justification for striking Brenda B., apart from its general reason for striking all eight stricken Black jurors—that they were not "good prosecution jurors on the issue of the death penalty."

The CSC concluded that the trial court's findings as to Brenda B. were supported by the record. It stated: "Because defendant had no prior criminal record, the prosecutor might

reasonably conclude that Brenda B.'s focus on rehabilitation made her an unfavorable jury [sic] for the prosecution on the penalty issue." *McDermott*, 28 Cal. 4th at 976.

The CSC did not make an unreasonable determination of the facts. While Brenda B. did identify herself as an eight out of ten on a scale in favor of the death penalty (with ten being most in favor), she also stated that she believes in the death penalty "only when there can be no rehabilitation at all." Moreover, Brenda B. provided hesitant, inconsistent answers and repeatedly returned to the issue of rehabilitation throughout voir dire. Therefore, Brenda B.'s response supports the prosecutor's rationale for exercising a peremptory strike.

McDermott contends that a comparison of Brenda B.'s views with that of white seated juror Kathryn P. shows the pretextual nature of the prosecutor's justification because Kathryn P. was "significantly more anti-death penalty." While Brenda B. and Kathryn P. both emphasized the role of remorse and rehabilitation in deciding whether the death penalty was appropriate, Kathryn P. eventually suggested that she could impose the death penalty if the circumstances of the murder were bad enough. She explained in voir dire that she may impose the death penalty "[b]ecause it may be that I just felt, you know, under those circumstances this person—this is the penalty that they should get for what they did." Brenda B., on the other hand, continued to emphasize that if rehabilitation was possible, she would not impose the death penalty.

This is not a situation where the comparative juror analysis demonstrates obvious pretext. Although it is a close question, reasonable jurists might disagree about the prosecutor's reasons for using a peremptory strike against

Brenda B.  Thus, in view of the level of deference at play in our analysis, we conclude that the CSC's finding that "Brenda B.'s views on the death penalty, rather than her race, were the basis for the prosecution's peremptory challenge" is not an unreasonable determination of the facts. *McDermott*, 28 Cal. 4th at 976.

**6. Prospective Juror Patricia M.**  The prosecution used a peremptory strike against potential juror Patricia M., a Black, forty-four-year-old, separated mother of two children, whose husband suffered from addiction.  The prosecution did not provide any particular justification for striking Patricia M., apart from its general reason for striking all eight stricken Black jurors—that they were not "good prosecution jurors on the issue of the death penalty."

The CSC found that Patricia M.'s "view that the death penalty did not serve any purpose and her stated inclination to impose life imprisonment rather than death for a premeditated murder carried out for financial gain" supported the trial court's finding that the strike was not pretextual.  *McDermott*, 28 Cal. 4th at 972.

The CSC's determination as to Patricia M. is supported by the record and by a comparative juror analysis.  For example, when asked what the appropriate penalty would be if she were to find McDermott guilty of first-degree murder with special circumstances, Patricia M. stated that she "would probably be more apt to say life without the possibility of parole."  And when asked whether a premeditated murder for financial gain was "the type of murder [she] would consider the death penalty for," she replied "[p]ossibly."  Moreover, she stated that she felt the death penalty does "[n]ot really" serve any purpose. Additionally, during voir dire, Patricia M. provided

inconsistent answers on her feelings about the death penalty in a case of first-degree murder with special circumstances of lying in wait and financial gain special circumstances.

While there were several seated and alternate white jurors who, like Patricia M., expressed equivocation on which punishment was worse, most of these jurors were strong prosecution jurors for other reasons, and none of them felt that the death penalty served no purpose. Accordingly, the CSC's rejection of McDermott's *Batson* claim as to Patricia M. is not based on an unreasonable determination of the facts.

***7. Prospective Juror Kathryn S***. The prosecution exercised a peremptory strike against potential juror Kathryn S., a thirty-two-year-old, Black, single woman who worked for the U.S. Postal Service. The prosecution did not provide any particular justification for striking Kathryn S., apart from its general reason for striking all eight stricken Black jurors—that they were not "good prosecution jurors on the issue of the death penalty."

The CSC determined that the trial court's finding was supported by the record because Kathryn S. "expressed considerable doubt that the death penalty was a harsher punishment than [LWOP] and she could not explain why she would ever choose the death penalty over [LWOP]." *McDermott*, 28 Cal. 4th at 977.

Here again, the CSC's determination that the prosecution had race-neutral reasons for challenging Kathryn S. is not an unreasonable interpretation of the record. For instance, when Kathryn S. was asked whether she would ever give the death penalty, she stated: "I don't know that I would . . . I don't know why I would ever give it or if I would." Further, Kathryn S. stated that in her view "life without possibility of

parole" was worse than the death penalty.  Although many of Kathryn S.'s responses were neutral toward the death penalty, some of her statements indicate that she carried doubt about whether she would ever impose the death penalty, providing sufficient reason for the prosecution to strike her.

The CSC's reasoning is also supported by the fact that the prosecutor offered to stipulate to Kathryn S.'s excusal because she felt that Kathryn S. had displayed a lack of comprehension and thus was "a total wild card for both sides."   This statement provides a "contemporaneous indication" of the prosecutor's state of mind and suggests that she thought the juror's unfitness was clear enough that the defense would agree to her dismissal.  *See Hoyos v. Davis*, 51 F.4th 297, 313 (9th Cir. 2022).  In light of the record and a comparative juror analysis, the CSC's decision as to Kathryn S. is not based on an unreasonable determination of the facts.

**8.  *Prospective Juror James T*.**   The prosecution exercised a peremptory strike against potential juror James T., a forty-one-year-old, Black, married man with two children, who had worked as a postal worker and served in the military, and who was active in the Baptist church.  The prosecution did not provide any particular justification for striking James T., apart from its general reason for striking all eight stricken Black jurors—that they were not "good prosecution jurors on the issue of the death penalty."

The CSC determined that the trial court's finding as to James T. was supported by the record due to James T.'s "expression of doubt about the moral legitimacy of the death penalty."  *McDermott,* 28 Cal. 4th at 978.

The CSC's determination that "substantial evidence supports the trial court's finding that the prosecutor could reasonably view James T. as unfavorable on the penalty issue" is not an unreasonable determination of the facts. *Id.* Although he stated that imposing the death penalty would not conflict with his religious views, he also stated that he would probably vote against the death penalty if it was on the ballot because "simply killing is wrong." *Id.* at 978. No seated juror stated that they would vote against the death penalty if it was on the ballot. Therefore, the record illustrates a legitimate non-racial reason for using a peremptory strike on James T.

McDermott relies on the fact that James T. repeatedly stated that his religious views did not conflict with the death penalty laws. However, many of James T.'s answers are to the contrary and show that he did not actually reconcile his religious beliefs with such laws. Furthermore, the prosecution questioned prospective non-Black jurors about their religious views, indicating that this was an important consideration. In light of the record, the CSC's decision as to James T. was not unreasonable.

***Overall Analysis.*** In sum, despite the numerical evidence, a comparative juror analysis demonstrates that the CSC's conclusion that the prosecutor's justifications for striking the eight Black jurors were non-pretextual was not unreasonable.

In addition to the comparative analysis, further evidence from the record supports the CSC's conclusion. First, the prosecution emphasized that it preferred Black jurors because McDermott is white and she made multiple racist statements that would come into evidence. *McDermott*, 28 Cal. 4th at 968. Second, the ethnicity of two prosecution

witnesses Marvin and Bell—who are both Black—tends to undercut any motive for the prosecutor to exclude Black individuals from the jury. *See Hernandez*, 500 U.S. at 369–70 (noting that the ethnicity of victims and prosecution witnesses could be taken as evidence of the prosecutor's sincerity).

Third, the trial court took a recess and reviewed the stricken jurors' questionnaires before assessing the prosecutor's credibility, suggesting that the court was not rubberstamping the prosecutor's strikes. *See Aleman v. Uribe*, 723 F.3d 976, 983 (9th Cir. 2013) (no purposeful discrimination where "the trial court conducted a thorough review of the record and twice assessed the prosecutor's credibility"); *Mitleider v. Hall*, 391 F.3d 1039, 1051 (9th Cir. 2004) (same where "the trial judge took a recess before ruling on the adequacy of the prosecutor's reasons").

Fourth, the prosecutor consistently questioned non-Black jurors on the same issues as she did the stricken Black jurors. The consistency in her lines of questioning and the questions' relevance to the circumstances of the case support the credibility of the prosecutor's justification for using peremptory strikes on these jurors. *Cf. Flowers v. Mississippi*, 139 S. Ct. 2228, 2246–47 (2019) (prosecutor's voir dire evidenced discrimination when prosecutor on average "asked 29 questions to each struck [B]lack prospective juror" but only "one question to each seated white juror").

And finally, there is no evidence of any misrepresentation of the record by the prosecutor when she was defending the strikes. *Cf. id.* at 2243. Indeed, the prosecution adequately presented race-neutral reasons for using a peremptory challenge on each of the jurors—

primarily their anti-death penalty views. Accordingly, the above factors weigh against a finding of pretext, and support the CSC's conclusion that discrimination did not motivate the prosecution's use of peremptory strikes.

Under AEDPA's deferential standard of review, the CSC's finding that the trial court did not err in determining that there was no purposeful discrimination was an objectively reasonable determination of the facts. McDermott cannot show that the only explanation for the prosecutor's use of peremptory challenges against the eight Black prospective jurors was on the basis of race. Therefore, although we grant a COA as to McDermott's *Batson* claim, we affirm the district court's denial of this claim.

## C.

Finally, we decline to grant COAs as to McDermott's remaining claims. McDermott claims she received ineffective assistance of counsel at three distinct trial phases: (1) during voir dire; (2) during the guilt phase; and (3) during the penalty phase. We may not review McDermott's uncertified claims unless we first grant a COA. 28 U.S.C. § 2253(c)(1)(A). Here, McDermott cannot show that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further" as to her ineffective assistance of counsel claims. *Miller-El I*, 537 U.S. at 336 (internal quotation marks omitted). Accordingly, we decline to address McDermott's remaining claims.

## V.

Under AEDPA's deferential standard of review, we must affirm the district court's denial of McDermott's

prosecutorial misconduct claim because the CSC did not issue a decision contrary to clearly established Supreme Court precedent on that claim.  Further, although we grant a COA as to McDermott's *Batson* claim, we affirm the district court's denial of the *Batson* claim because the CSC's finding of no purposeful discrimination was not an unreasonable determination of the facts.  Finally, we deny COAs as to McDermott's remaining claims.[4]

**AFFIRMED.**

---

[4] The Court grants McDermott's unopposed motion to expand the record (Docket No. 18).  The Court grants in part McDermott's unopposed motion to take judicial notice (Docket No. 41), as to the documents included in the state court record, but denies the motion as moot in part as to the *People v. Sandoval* transcripts.