NOT FOR PUBLICATION

**FILED**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

AUG 5 2024

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| DONALD SHERMAN, | No.   16-99000 |
| Petitioner-Appellant, | D.C. No. 2:02-cv-01349-LRH-VCF |
| v. | |
| WILLIAM GITTERE, Warden; AARON DARNELL FORD, Attorney General of Nevada, | AMENDED MEMORANDUM[*] |
| Respondents-Appellees. | |

Appeal from the United States District Court
for the District of Nevada
Larry R. Hicks, District Judge, Presiding

Argued and Submitted September 20, 2023
San Francisco, California

Before:  GOULD, BADE, and BUMATAY, Circuit Judges.

After a jury trial in Nevada state court, Donald Sherman was convicted of

robbery, burglary, and first-degree murder.  After unsuccessful state postconviction

proceedings, Sherman filed a federal habeas petition subject to the Antiterrorism and

---

[*]     This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

Effective Death Penalty Act ("AEDPA").  The district court denied the petition and granted a certificate of appealability ("COA") on one claim.  We addressed Sherman's certified claim in a concurrently published opinion.  In this memorandum disposition, we consider his request to expand the COA to include seven additional claims.

Under AEDPA, a petitioner seeking a certificate of appealability on the denial of constitutional rights "must demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further." *Lambright v. Stewart*, 220 F.3d 1022, 1025 (9th Cir. 2000) (brackets in original) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983)) (internal quotation marks omitted).  When a petitioner seeks a COA on the denial of a claim on procedural grounds, the court must determine whether "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right," and whether "jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.* at 1026 (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

We decline to expand the COA.

# I.

### *Uncertified Claim #1 – Ineffective Assistance of Counsel Claim Under Martinez*

Sherman first seeks to expand the COA to include the district court's dismissal of his ineffective-assistance-of-counsel claim as procedurally defaulted. While Sherman's first post-conviction counsel raised at least three ineffective-assistance-of-trial-counsel subclaims in his first state postconviction petition, Sherman contends that several subclaims were omitted, which led to them being procedurally barred. He argues that the district court erred in rejecting his *Martinez* arguments because it failed to apply the correct standard for determining whether the claims of ineffective assistance of counsel had "some merit." *See Martinez v. Ryan*, 566 U.S. 1, 17 (2012) (explaining that failure to raise a claim of ineffective assistance of counsel in an initial-review post-conviction proceeding does not bar a federal habeas court from considering a substantial claim of ineffective assistance of trial counsel, if counsel in the initial post-conviction proceeding was ineffective). We review a district court's dismissal for procedural default de novo. *See Fields v. Calderon*, 125 F.3d 757, 759–60 (9th Cir. 1997).

A federal court is precluded from reviewing procedurally defaulted claims unless the petitioner can establish "cause" for the default and "prejudice" as a result of the federal violation. *Coleman v. Thompson*, 501 U.S. 722, 729, 745 (1991). A

petitioner can establish cause and prejudice to overcome the procedural default of an ineffective assistance of trial counsel claim if the petitioner can show that "(1) post-conviction counsel performed deficiently; (2) 'there was a reasonable probability that, absent the deficient performance, the result of the post-conviction proceedings would have been different'; and (3) the 'underlying ineffective-assistance-of-trial-counsel claim is a substantial one.'" *Dickinson v. Shinn*, 2 F.4th 851, 858 (9th Cir. 2021) (quoting *Ramirez v. Ryan*, 937 F.3d 1230, 1242 (9th Cir. 2019)). A claim is "substantial" if it has "some merit." *Id.* (quoting *Martinez v. Ryan*, 566 U.S. 1, 14 (2012)). Because the district court's dismissal of Sherman's claims of ineffective assistance of counsel as procedurally barred is not debatable, we do not expand the COA to include these claims.[1]

Sherman raises multiple ineffective-assistance-of-trial-counsel subclaims: (a) trial counsel failed to effectively litigate the motion in limine excluding evidence about his ex-girlfriend, Dianne Bauer; (b) trial counsel failed to raise Dianne's

---

[1] The parties dispute whether the evidence submitted in support of Sherman's defaulted ineffective assistance of counsel claims in his second post-conviction proceeding is considered part of the state court record that the federal habeas court can consider. *See Shinn v. Ramirez*, 596 U.S. 366, 382 (2022) (holding "that, under § 2254(e)(2), a federal habeas court may not conduct an evidentiary hearing or otherwise consider evidence beyond the state-court record based on ineffective assistance of state postconviction counsel."). We need not resolve this issue because, assuming that this evidence is considered part of the state court record, Sherman fails to satisfy the *Martinez* standard for excusing the procedural default of his claims of ineffective assistance of counsel.

history of fabricating sexual abuse allegations; (c) trial counsel failed to present testimony about Sherman's relationship with Dianne and her desire for her father's death; (d) trial counsel failed to demonstrate that Dianne lied about contacting law enforcement about her father's safety; (e) trial counsel did not move for a new trial based on Dianne's false trial testimony; (f) trial counsel failed to present available mitigating evidence; (g) trial counsel failed to present appropriate expert testimony; (h) trial counsel did not effectively counter the State's presentation of Sherman's previous murder conviction; and (i) trial counsel failed to rebut the State's presentation of future dangerousness. He also claims that trial counsel's ineffectiveness should be considered cumulatively. Because "jurists of reason" would not "find it debatable whether the petition states a valid claim of the denial of a constitutional right," or "whether the district court was correct in its procedural ruling," we deny a COA on this claim. *Lambright*, 220 F.3d at 1026.[2]

*Dianne Bauer:* On the various subclaims of ineffectiveness in investigating, impeaching, and litigating issues related to Dianne Bauer, we find no deficient performance or prejudice. Regarding the motion in limine, the record adequately shows that trial counsel made a cogent argument against the State's motion and

---

[2] Sherman also claims that the district court improperly dismissed five ineffective assistance subclaims as "non-cognizable." Those subclaims involve issues related to the use of a stun belt, the venire composition, the reasonable doubt instruction, prosecutorial misconduct, and the penalty-phase instruction. We agree with the district court that these subclaims are insubstantial.

presented a detailed offer of proof. Even if trial counsel failed to object to the motion in limine on procedural grounds, the trial court could have excused any error or excluded the evidence that Sherman presented question-by-question. *See Hernandez v. State*, 124 Nev. 639, 647–50 (2008).

Regarding allegations of ineffectiveness related to Dianne's past claims of sexual abuse, her failure to contact police about the threat to Dr. Bauer, or her desire for his death, we see no prejudice. The jury heard that Dianne had manipulated Sherman based on her desire for her father's money by claiming that her father sexually abused her and her daughter. Additionally, while this evidence may explain why Sherman traveled to Las Vegas, it does not negate premeditation or otherwise show what happened when he arrived at Dr. Bauer's house in Las Vegas.

*Mitigating Evidence*: Sherman next argues that trial counsel did not investigate and present all reasonably available mitigating evidence regarding his family's history of poverty and physical, sexual, and substance abuse or the abuse he suffered while incarcerated for his prior murder conviction. As Sherman concedes, however, much of this evidence was cumulative of information that his trial counsel discovered about his background. As such, "[t]his is not a case in which the defendant's attorneys failed to act while potentially powerful mitigating evidence stared them in the face." *Bobby v. Van Hook*, 558 U.S. 4, 11 (2009). Instead, "there comes a point at which evidence . . . can reasonably be expected to be only

cumulative, and the search for it distractive from more important duties." *Id.* To the extent that Sherman argues that counsel was ineffective for failing to present the new mitigation evidence, he does not explain why it was unreasonable for trial counsel to decide against presenting additional evidence of his dysfunctional family background, his family's violent and addictive nature, and history of sexual and physical abuse when that evidence could have undermined the defense theory that Sherman was a good child who was loved by friends and family but who was manipulated into committing the murder. *See Burger v. Kemp*, 483 U.S. 776, 789–94 (1987) (concluding that counsel's failure to discover and present evidence of petitioner's troubled and unstable childhood was not deficient in part because the evidence "suggest[ed] violent tendencies that are at odds with the defense's strategy of portraying the petitioner's actions on the night of the murder as the result of [someone else's] strong influence upon his will").

*Expert Testimony:* Sherman further alleges that counsel performed deficiently by selecting an unlicensed psychologist, Dr. Stephen Pittel, as an expert and by failing to provide him with all relevant mitigating evidence. In Nevada, however, an expert does not need to be licensed to qualify as an expert. *See Wright v. Las Vegas Hacienda, Inc.*, 720 P.2d 696, 697 (Nev. 1986) ("A witness need not be licensed to practice in a given field in order to be qualified to testify as an expert."). And the record does not suggest that trial counsel failed to provide Dr. Pittel with

relevant background information or that Dr. Pittel was missing critical information for his evaluation. Indeed, the one piece of information that Sherman alleges Dr. Pittel lacked in his analysis (information about Diane's allegations of sexual abuse concerning her daughters) was information that Dr. Pittel testified would not have *altered* his analysis.

*Prior Murder Conviction*: Sherman next argues that trial counsel was ineffective for failing to present evidence minimizing his role during the 1981 murder that led to his prior murder conviction or to impeach the State's witness on the conviction. But as the district court found, "trial counsel made a substantial effort to rebut the State's evidence related to the Idaho murder." Indeed, trial counsel called Idaho prosecutor Phillip Robinson, who testified that Sherman did not premediate the killing, that his accomplice prepared and planned the robbery and murder, and that the accomplice was more criminally sophisticated than Sherman. Sherman argues that trial counsel failed to present other evidence regarding the details of the Idaho offense, victim impact testimony, or evidence to impeach the state's witness. Based on the sentencing transcript in the Idaho case, including Sherman's admission that he shot and killed the victim, and Robinson's testimony, Sherman has not demonstrated that, but for trial counsel's failure to investigate and present additional evidence related to the Idaho murder, there is reasonable probability that the outcome of the proceeding would have been different. *See*

*Cullen v. Pinholster*, 563 U.S. 170, 201 (2011) (taking into account that presenting certain mitigating evidence could open the door to rebuttal evidence); *see Lambright*, 220 F.3d at 1026.

*Future Dangerousness:* Sherman also argues that trial counsel was ineffective for failing to retain an institutionalization expert at the penalty phase to rebut the State's argument regarding his future dangerousness. The record shows that Sherman's trial counsel considered hiring an institutionalization expert but she could not recall whether she "had a strategic justification," for not pursuing such evidence. This is not enough to "overcome the 'strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance.'" *Burt v. Titlow*, 571 U.S. 12, 23 (2013) (brackets in original) (quoting *Strickland v. Washington*, 466 U.S. 668, 689 (1984)). Sherman relies on a declaration from Dr. Cunningham to argue that had trial counsel hired an institutionalization expert, she could have presented testimony that there was a low probability that Sheman would commit violent acts in prison. But he has not made a "substantial showing of a 'reasonable probability that, but for counsel's [alleged] unprofessional errors, the result of the proceeding would have been different.'" *Runningeagle v. Ryan*, 825 F.3d 970, 982 (9th Cir. 2016). The jury had heard evidence of the circumstances of the crime, Sherman's prior murder conviction, and of Sherman's conduct while in jail awaiting trial—including planning to escape using violence—and Sherman has not made a

substantial showing of a reasonable likelihood that Dr. Cunningham's general testimony would have overcome that evidence and led to a different outcome.

*Cumulative Error:* Sherman finally argues that the district court failed to consider the cumulative prejudicial effect of the procedurally defaulted ineffective assistance claims. But "[w]e reject [Sherman's] cumulative error argument, which would require us to accumulate a number of trial-level IAC claims that we have found insubstantial or unsuccessful on the merits." *See Runningeagle*, 825 F.3d at 990 n.21.

### Uncertified Claim #2 – Brady/Napue Claim

Sherman next seeks to expand the COA over his claim that the prosecution violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose impeachment evidence against Dianne Bauer and jailhouse informants Michael Placencia and Christine Kalter.[3] To succeed on a *Brady* claim, a petitioner must show that the evidence: (1) is favorable to the accused; (2) was suppressed by the prosecution; and (3) was material. *See Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed

---

[3] Sherman also alleges that the State failed to disclose exculpatory and impeachment information regarding Sherman's prior conviction. This contention, however, is contained in a single reference and is unsupported by argument or citation, and we decline to address it. *See Humble v. Boeing Co.*, 305 F.3d 1004, 1012 (9th Cir. 2002) ("Issues raised in a brief but not supported by argument are deemed abandoned absent manifest injustice.").

to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). The Nevada Supreme Court concluded that *Brady* was not violated because the undisclosed evidence concerning Dianne Bauer, Placencia, and Kalter was not material.

Sherman alleges that, contrary to Dianne Bauer's testimony, the State knew that she had not notified the Longview Police Department ("LPD") or the FBI that Sherman posed a danger to her father. Sherman also alleges that the State failed to disclose certain LPD files, including (1) investigative notes indicating that officers spoke with Dianne several times but that she did not inform them that Dr. Bauer was in danger, and (2) files containing statements from other witnesses that Dianne and Sherman had planned Dr. Bauer's murder because Dianne learned that Dr. Bauer had cut her out of his will.

The Nevada Supreme Court's conclusion that such evidence was not material was not contrary to clearly established federal law. The evidence would have been subject to the trial court's motion in limine prohibiting Sherman from impeaching Dianne with extrinsic evidence, which would render the evidence inadmissible. *See* Nev. Rev. Stat. § 50.085(3). And Sherman's convictions were based largely on his confession to two separate people, the method and time of killing, his actions after the killing, and his arrest after being found in Dr. Bauer's car with Dr. Bauer's property. Dianne did not provide key evidence of Sherman's guilt. Thus, the alleged

11

failure of the State to disclose the evidence against Dianne does not "undermine[] confidence in the outcome of the trial." *See Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (citation omitted) (defining materiality).

Sherman next contends that the State failed to disclose that Placencia had a 1991 felony conviction for use of a controlled substance and that Kalter had conducted controlled drug buys as a confidential informant for the Las Vegas police. Even under de novo review, we conclude that the failure to disclose Placencia's 1991 felony conviction and the failure to disclose Kalter's prior informant status was not material because Sherman has not shown "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *See Bagley*, 473 U.S. at 682. The jury already knew that Placencia had a history with law enforcement—indeed, he met Sherman when they were both incarcerated. Additionally, the jury heard evidence that corroborated Placencia's statements and independently supported Sherman's role in the escape plan. Evidence of Kalter's history as a paid police informant in other unrelated investigations has general impeachment value. *See Gentry v. Sinclair*, 705 F.3d 884, 905 (9th Cir. 2013) (observing that evidence that a jailhouse witness was a paid informant has impeachment value). Sherman, however, fails to explain how, if this evidence had been disclosed, there is a reasonable probability that the outcome of the proceeding would have been different. *See Kyles*, 514 U.S. at 435. After all, the

12

jury had seen Sherman's several letters to Kalter which corroborated her accounting of Sherman's planned escape attempt.

Sherman alleges that the State failed to disclose that Placencia received benefits in three pending criminal cases in exchange for his cooperation, including a deal with the State to release Placencia from custody over a month early in a misdemeanor case.[4] Sherman also alleges that in exchange for Kalter's cooperation in Sherman's case, the State reduced her pending first-degree murder charge to manslaughter and did not oppose her request for release from custody after her guilty plea in that case.

The Nevada Supreme Court's determination that any favorable treatment received by Placencia or Kalter was not related to their cooperation against Sherman was not an unreasonable factual determination. *See* 28 U.S.C. § 2254(d)(2). And we agree with the district court, "[g]iven [the] strength of . . . corroborating evidence, Sherman's allegations about inducements or benefits allegedly received by Placencia and Kalter, even if true, would not undermine this court's confidence in the outcome of Sherman's trial." *See Strickler*, 527 U.S. at 281–82. For these same

---

[4] Sherman fails to support his claim that the State did not disclose that Placencia was a "career criminal informant who had a history of escape and failure to appear and often curried favor with prosecutors to avoid incarceration." He cites to more than 200 pages of state-court criminal records without identifying how the records support his assertion that Placencia was a career informant. This argument is thus forfeited. *See Humble*, 305 F.3d at 1012.

13

reasons, Sherman has not established that trial counsel was ineffective for failing "to investigate, uncover, and present evidence that State witnesses received undisclosed benefits." *See Strickland*, 466 U.S. at 691.

Relatedly, Sherman alleges that the State violated *Napue v. Illinois*, 360 U.S. 264 (1959), when it failed to correct the false testimonies of Dianne and Las Vegas Police Sergeant Gayland Hammack. To establish a constitutional violation under *Napue*, Sherman must demonstrate that: (1) the testimony or evidence is false or misleading; (2) the prosecution must or should have known that the testimony was false or misleading; and (3) the challenged testimony is material. *See Panah v. Chappell*, 935 F.3d 657, 664 (9th Cir. 2019).

Sherman alleges that the State violated *Napue* by failing to correct Dianne's testimony that she contacted the LPD to warn them that Dr. Bauer was in danger and Sergeant Hammack's testimony that Placencia did not receive any benefits outside of $300. The Nevada Supreme Court acknowledged Sherman's argument related to the State's failure to correct the alleged false testimony but did not specifically explain its ruling on this issue. We presume the state court decided this issue on the merits. *See Williams*, 568 U.S. at 301. And we consider "what arguments or theories . . . could have supported[] the state court's decision; and then . . . ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Richter*,

14

562 U.S. at 102. Fair-minded jurists could conclude that the absence of a record in the LPD files showing that Dianne informed them of a danger to Dr. Bauer did not demonstrate that Dianne's testimony was false. *See United States v. Houston*, 648 F.3d 806, 814 (9th Cir. 2011) (noting that mere "evidence creating an inference of falsity" is not enough). Similarly, the record does not indicate that Placencia received any undisclosed benefits[5] and so reasonable jurists could conclude that Sergeant Hammack's testimony was not false.

### *Uncertified Claim #3 – Prosecutorial Misconduct Claim*

Sherman seeks to expand the COA to include his claim that the prosecutor committed numerous instances of misconduct during closing arguments. He argues that the district court erred by dismissing the entire claim as unexhausted and procedurally barred. The record reflects that, although Sherman alleged several

---

[5] With respect to this allegation, Sherman argues for the first time in his supplemental reply brief that the issue on appeal is not the reasonableness of the state court's determination of this claim under § 2254(d), but "whether Sherman demonstrated good cause for discovery under Rule 6(a) of the Rules Governing Section 2254 Cases." Aside from a one-sentence request for this court to remand for discovery and factual development as an alternative remedy, Sherman's opening brief discusses the merits of his *Brady* and *Napue* claims. His only reference to discovery, however, is a single sentence asking the court to remand for discovery and factual development as an alternative remedy. Sherman does not request a certificate of appealability on the denial of discovery. The discovery issue is not properly raised. *See Koerner v. Grigas*, 328 F.3d 1039, 1048 (9th Cir. 2003) ("[W]e will not ordinarily consider matters on appeal that are not specifically and distinctly argued in appellant's opening brief.") (internal quotation marks and citation omitted).

instances of prosecutorial misconduct in the district court, he presented only two of those instances on direct appeal.

First, Sherman alleged that the prosecutor improperly reminded the jury that Dianne had referred to Sherman as a "creep" after that testimony had been stricken. Second, Sherman alleged that the prosecutor committed misconduct during the penalty-phase closing argument by "telling the jury to execute him to save the lives of future victims in the prison system." While Sherman's prosecutorial-misconduct claim was not procedurally defaulted and was addressed by Nevada Supreme Court, *see Sherman v. State*, 965 P.2d 903, 912, 914–15 (Nev. 1998), we deny a COA on this claim because jurists of reason would not find it "debatable whether the petition states a valid claim of the denial of a constitutional right." *Lambright*, 220 F.3d at 1026. A prosecutor's improper comments during argument will violate the Constitution only if they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (citation omitted). The state court reasonably concluded that the prosecutor's isolated reference to stricken testimony, which the prosecutor acknowledged was improper and asked the jury to disregard, did not "infect[] the trial with unfairness." *Id.* So too with the prosecutor's reference to Sherman's potential future dangerousness, *see California v. Ramos*, 463 U.S. 992, 1005–07 (1983) (recognizing that a "consideration of the defendant's future dangerousness

16

[is] an inquiry common throughout the criminal justice system" and as such is appropriate for the jury to consider during sentencing), especially when viewed in light of the "overwhelming evidence [that] supported the jury's finding of [the] four aggravating factors," *Sherman*, 965 P.2d at 915.

### *Uncertified Claim #4 – Voir Dire*

Sherman next seeks to expand the COA to include his claim that the trial court's improper comments during voir dire violated his due process and Eighth Amendment rights. Sherman argues that the trial court improperly stated that the Bible prescribes the death penalty as punishment, improperly rehabilitated jurors who said that they could not consider a life sentence for capital murderers, informed potential jurors that they did not have an individual responsibility when issuing a verdict, and restricted counsel's voir dire questioning. Sherman also asserts that his trial counsel was ineffective for failing to object to the trial court's comments. The Nevada Supreme Court concluded that the judge's "reference to religious authority for capital punishment was inappropriate," but that Sherman was not prejudiced by counsel's failure to challenge the trial court's remarks.

We assume that de novo review applies to Sherman's Eighth Amendment claim. *See Ayala v. Wong*, 756 F.3d 656, 670 & n. 8 (9th Cir. 2014) (reviewing de novo a state court's conclusion of constitutional error and applying *Brecht* without addressing the state court's conclusion of harmlessness), *rev'd on other grounds sub*

17

*nom. Davis v. Ayala*, 576 U.S. 257 (2015). Sherman provides no authority to support his argument that a trial court's comments during voir dire can violate the Eighth Amendment. Sherman's reliance on *Sandoval v. Calderon*, 241 F.3d 765 (9th Cir. 2000) to support his argument is unpersuasive. *Sandoval* concerns the comments of a prosecutor during closing argument, that "God sanctioned the death penalty for people like [the defendant]," that the jury would be "doing what God says," and that sentencing the defendant to death might save his soul. *Id.* at 775–76. We determined that these arguments violated the Eighth Amendment because they did not "carefully focus[] the jury on the specific factors it is to consider in reaching a verdict." *Id.* at 776. We also noted that the argument that a higher power directed the imposition of a death sentence transferred the jury's sense of responsibility. *Id.* at 777. In contrast, the challenged comments at issue were made by the trial court during death qualification of the prospective jurors. The transcripts support the Nevada Supreme Court's determination that the trial court's comments about the Bible "were limited to determining whether the juror[s] could consider the death penalty as a possible form of punishment." *See Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (clarifying that, in a capital case, a prospective juror may be excused for cause if the juror's views on capital punishment would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath (citation omitted)). It is unlikely that the trial court's comments were understood by the jury

18

to be a factor for them to consider when reaching a sentencing decision. *Cf. Sandoval*, 241 F.3d at 776. In addition, any harm from the trial court's comments about the Bible would not have had a "substantial and injurious effect or influence in determining the jury's verdict," *Brecht*, 507 U.S. at 623, when the comments were made to the prospective jurors during voir dire and, therefore, were remote in time from the trial court's instructions at the guilty and penalty phases and from the jury's deliberations, and when the potential jurors involved were not seated on the jury.

Sherman also argues that the trial court inappropriately told potential jurors that they had no individual responsibility when issuing a verdict in the penalty phase, in violation of the Supreme Court's ruling in *Caldwell v. Mississippi*, 472 U.S. 320 (1985). In *Caldwell*, the Supreme Court held that a capital sentence is invalid when the sentencing jury is led to believe that the responsibility for determining the appropriateness of a death sentence does not rest with the jury. *Id.* at 323. In contrast, the trial court here stated that the jurors would make "a judgment" on the sentence and noted that the jurors would make that decision as members of the jury.

Sherman also argues that the trial court gave "improper" and "deceptive" hypotheticals to rehabilitate jurors. The challenged hypotheticals that the trial court gave during voir dire were directed at determining whether the potential jurors could give equal consideration to the three possible forms of punishment—the death penalty, life imprisonment without the possibility of parole, and life imprisonment

with the possibility of parole. The trial court properly conducted an inquiry "to identify unqualified jurors." *See Morgan v. Illinois*, 504 U.S. 719, 729 (1992). "[M]any veniremen simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear'; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings." *Wainwright*, 469 U.S. at 424–25. "[T]his is why deference must be paid to the trial judge who sees and hears the juror." *Id*. at 426. Sherman has not cited any authority that supports his assertion that the trial court's hypotheticals violated his due process or Eighth Amendment rights.

Regarding Sherman's assertion of ineffective-assistance-of-counsel, we see no prejudice from the trial counsel's failure to object to the trial court's comments.[6]

*Uncertified Claim #5 – First-Degree Murder Statute Vagueness*

---

[6] In addition to arguing that the trial court made improper comments to the prospective jurors, Sherman asserts that the trial court impeded defense counsel's ability to question them to determine whether they could consider mitigating evidence. He points to the trial court's directing defense counsel "to get to the real question" and "cut[ting] off" questioning about whether a person's background and upbringing impacted their culpability. Sherman does not support this claim with citation to any authority and has not shown that reasonable jurists would find it debatable whether the trial court denied a constitutional right. *See Jones v. Gomez*, 66 F.3d 199, 204–05 (9th Cir. 1995) (stating that conclusory allegations are insufficient to support habeas relief); *see also See Mu'Min v. Virginia*, 500 U.S. 415, 424 (1991) (noting that trial courts have "great latitude in deciding what questions should be asked on voir dire," including restricting inquiries of counsel).

Sherman requests that we extend the COA to include his claim that Nevada's "statutory scheme" for first-degree murder, including its related jury instruction, is unconstitutionally vague because the Nevada Supreme Court's interpretation of the statute erased any distinction between premeditated first-degree murder and intentional second-degree murder. Under Nevada law, first-degree murder includes murder perpetrated by "willful, deliberate and premeditated killing." Nev. Rev. Stat. § 200.030(1)(a); *Nika v. State*, 198 P.3d 839, 842, 845 (Nev. 2009). To the extent that Sherman's argument is understood as challenging the statute itself, he waived this issue by failing to properly present it in his operative petition for writ of habeas corpus filed in the district court. *See Allen v. Ornoski*, 435 F.3d 946, 960 (9th Cir. 2006); *see also Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994). At the time of Sherman's 1997 trial, the jury instruction on premeditation allowed a jury to conclude that a murder was "willful, deliberate and premeditated" if it found premeditation. *Nika*, 198 P.3d 839 at 844–47 (discussing the so-called *Kazalyn* instruction). The Nevada Supreme Court reasonably determined that Sherman's challenge to the jury instruction failed.

The instruction accurately stated Nevada law at the time of Sherman's trial. *Id*. Even if we assume that the jury instruction on first-degree murder failed to differentiate between premeditation and intentional second-degree murder, it is not debatable whether the error had a substantial or injurious effect because the trial

21

court gave additional jury instructions that differentiated between first- and second-degree murder. *See Lambright*, 220 F.3d at 1025. While first-degree murder required premeditation, second-degree murder did not. Constitutional errors do not warrant habeas relief except when they are prejudicial or structural, *Brecht v. Abrahamson*, 507 U.S. 619, 629–30 (1993), and Sherman cites no cases when we have found vagueness errors to be structural in the habeas context.

### Uncertified Claim #6 – Sentence

Sherman seeks to expand the COA to include three alleged violations of his Eighth Amendment and Fourteenth Amendment rights to a reliable sentence. He argues that the Nevada Supreme Court failed to provide close appellate scrutiny of his death sentence, that the State introduced improper victim impact testimony, and that the prior murder statutory aggravating circumstance improperly relied on a juvenile conviction.

After the Nevada Supreme Court invalidated two of Sherman's aggravating factors, it reweighed the two remaining aggravating factors, along with the mitigation evidence presented at trial, and found that the jury still would have found Sherman eligible for the death penalty. When a death sentence is based in part on an invalid aggravating factor, an appellate court can uphold the sentence if it either reweighs the aggravators and mitigators or reviews the sentence for harmless error. *See Clemons v. Mississippi*, 494 U.S. 738, 741, 751–54 (1990). Sherman argues that

the Nevada Supreme Court overlooked the cumulative effect of the errors it identified on direct appeal when reviewing the sentence for harmless error.

First, Sherman does not cite authority to support his contention that evaluating harmless error for one issue requires or permits cumulative error analysis of all errors in that evaluation. Second, Sherman does not explain how or why guilt phase errors should cumulate with penalty phase errors, and Nevada caselaw does not appear to allow cumulation of errors across different phases of trial. *See Jeremias v. State*, 412 P.3d 43, 55 (Nev. 2018) ("Although we have identified several arguable errors, they occurred at different portions of the proceedings (jury selection, the guilt phase, and the penalty phase). Jeremias offers no explanation as to whether, or how, this court should cumulate errors across different phases of a criminal trial."). Third, Sherman is incorrect that the Nevada Supreme Court was required to examine *all* available mitigating evidence, including evidence adduced post-trial, after ruling an aggravating factor invalid. As we have said, "[u]nder *Clemons*, the state appellate court reweighs aggravating and mitigating circumstances that have already been found by a jury to exist." *Valerio v. Crawford*, 306 F.3d 742, 757 (9th Cir. 2002) (en banc).

Sherman claims that the Nevada Supreme Court violated his right to equal protection because it has previously considered new mitigating evidence not presented at trial on reweighing in other cases. Sherman cites *State v. Bennett*, 81

23

P.3d 1 (Nev. 2003) and *State v. Haberstroh*, 69 P.3d 676 (Nev. 2003). But those cases are not similarly situated to Sherman's case. In *Bennett,* the Nevada court found several *Brady* violations and its *Brady* analysis required consideration of the undisclosed evidence to determine whether it was material to establish prejudice under the state law cause and prejudice standards to excuse a procedural bar to review of a postconviction petition. 81 P.3d at 8. But here, the Nevada Supreme Court found no *Brady* violation; therefore, Sherman has not demonstrated that he was similarly situated to the petitioner in *Bennett*. In *Haberstroh*, the Nevada Supreme Court simply observed that the petitioner presented new mitigation evidence related to a claim of ineffective assistance counsel in the penalty phase. *Haberstroh*, 69 P.3d at 683 n. 22. The court remanded for resentencing because it could not say the jury's consideration of an invalid aggravating factor was harmless. *Id*. at 683–84. Contrary to Sherman's claim, the court in *Haberstroh* did not expressly mandate that the reviewing state court consider new evidence in postconviction proceedings. *Id*.

Sherman also argues that the State elicited improper victim-impact evidence during the penalty phase about the victim from the 1981 Idaho murder. The State elicited testimony that the victim's family and community were "incensed" after the murder and that the victim was a "nice man." Sherman acknowledges that evidence about the victim and the impact of a defendant's actions on the family of the victim

24

of a crime for which a defendant is on trial may be admissible during the penalty phase. *See Payne v. Tennessee*, 501 U.S. 808, 827 (1991). He argues that the victim impact evidence related to the victim of a prior murder falls outside of the scope of *Payne*. Sherman does not, however, present any clearly established law prohibiting victim-impact testimony from a previous crime under the Eighth Amendment. As such, Sherman is not entitled to relief under AEDPA. *See Brewer v. Hall*, 378 F.3d 952, 955 (9th Cir. 2004).

Lastly, we consider Sherman's claim that the State improperly relied on his juvenile conviction in Idaho to support the prior-murder aggravating circumstance. He cites *Roper v. Simmons*, 543 U.S. 551 (2005), to support the assertion that using his juvenile conviction to expose him to death eligibility is unconstitutional. *Roper* held that the Eighth Amendment prohibits imposing the death penalty on juvenile offenders under eighteen. 543 U.S. at 568. It does not establish that a prior juvenile conviction may not form the basis for an aggravating factor in a capital case. *See Melton v. Sec'y, Fla. Dep't Corrs.*, 778 F.3d 1234, 1237 (11th Cir. 2015) (concluding that neither *Roper* nor any other Supreme Court precedent "suggests that a prior conviction from youth may not form the basis for an aggravating factor in a capital case.") Because there is no clearly established law on this issue, under AEDPA, Sherman cannot be entitled to relief. *See Brewer*, 378 F.3d at 955. We

25

deny Sherman's request for a COA on this claim because its merit is not debatable. *See Lambright*, 220 F.3d at 1025.

### *Uncertified Claim #7 – Cumulative Error*

Sherman lastly argues that the cumulative impact of errors at trial, on appeal, and in postconviction proceedings violated his constitutional rights and had a substantial and injurious effect on the jury's verdict. In denying Sherman's motion for reconsideration, the district court correctly noted that the cumulative-error claim was not exhausted because he failed to fairly present it to the Nevada courts as a separate claim. *See Wooten v. Kirkland*, 540 F.3d 1019, 1025–26 (9th Cir. 2008). A claim of cumulative error must be exhausted in state court. *Id.* Sherman does not acknowledge the district court's procedural ruling or dispute that he failed to properly present a claim of cumulative error to the state court. Additionally, he has not presented any argument to excuse the procedural bar to federal habeas review of this claim. Accordingly, we deny his request to expand the COA to include this claim because "jurists of reason" would not "find it debatable whether the district court was correct in his procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

## II.

***Motion for Judicial Notice***

We grant Sherman's motion to take judicial notice of a copy of his trial transcript. Dkt. No. 68. The transcript was admitted as an exhibit at trial, both parties refer to it in their appellate briefs, and the State does not dispute that the document is an accurate copy of the admitted exhibit. *See Harris v. Cnty. of Orange*, 682 F.3d 1126, 1131–32 (9th Cir. 2012) ("We may take judicial notice of undisputed matters of public record, including documents on file in federal or state courts." (citations omitted)).

## III.

Based on the foregoing, we deny Sherman's request to expand the COA to include the seven uncertified issues. We also grant the motion for judicial notice.

**AFFIRMED.**